Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

*April 12*, 20 *18*

WILLIAM M. McCOOL, Clerk

By _____ Deputy

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. **CR18-092 RAJ** |
| Plaintiff, | |
| v. | **INDICTMENT** |
| BERNARD ROSS HANSEN, | |
| a/k/a Ross B. Hansen, | |
| and | |
| DIANE RENEE ERDMANN, | |
| a/k/a Diane Renee, | |
| Defendants. | |

The Grand Jury charges that:

## INTRODUCTION

1.      At all times relevant to this Indictment, Northwest Territorial Mint (NWTM) was a business headquartered in the Western District of Washington, with offices in Federal Way and Auburn.

2.      NWTM operated both a custom business that involved the manufacturing of medallions, coins, and other awards, and a bullion business that involved the selling, buying, exchanging, storing, and leasing of gold, silver, and other precious metals.

INDICTMENT/HANSEN, et al. - 1

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      NWTM sold bullion in multiple ways.  It sold bullion to customers for later delivery ("standard bullion customers").  Standard bullion customers placed orders through the NWTM website or through telephone calls to NWTM sales representatives. Standard bullion customers were required to pay by wire transfer or by check.  Then, standard bullion customers were promised delivery at a future date, usually 8-10 weeks later.  Of the types of bullion sales, standard bullion customer sales brought in the most revenue to NWTM.

4.      NWTM sold smaller amounts of bullion, with shorter delivery times, and up-front payment terms, to certain customers.  These smaller bullion customers also purchased through the website, but these customers typically used credit cards for their purchases and were typically promised delivery within 14-21 days.  NWTM also sold bullion that was on-hand to walk-in customers at its office.  In addition to selling bullion, NWTM also purchased and exchanged bullion in order to use that bullion to fill orders.

5.      NWTM also offered secure storage to its bullion-storage customers, who stored bullion at NWTM locations for a yearly fee.  Additionally, NWTM had bullion-lease customers, who provided bullion to HANSEN and NWTM for short-term use in the business, in exchange for interest payments in the form of additional bullion.  Under both the bullion-storage and the bullion-lease program, NWTM was required to either liquidate customers' bullion or return the customers' property within 30 days of customers' requests.

6.      The NWTM bullion customers were located throughout the United States and the world.  All transactions involving NWTM's bullion purchase, sales, and exchange, as well as NWTM's bullion-storage and bullion-lease customers, were conducted in the Western District of Washington.

7.      Defendant BERNARD ROSS HANSEN ("HANSEN"), also known as "Ross Hansen," was the founder, the President, and the CEO of NWTM.  HANSEN founded NWTM in the 1980s, in Auburn, Washington.  In approximately 2009, HANSEN moved the NWTM business headquarters to Federal Way, Washington.

INDICTMENT/HANSEN, et al. - 2

1   HANSEN eventually opened other NWTM offices and manufacturing facilities,

2   including locations in Nevada, Hawaii, and Texas.  HANSEN's duties included dictating

3   the pricing and delivery terms for bullion sales, determining how NWTM would spend

4   incoming money, and acquiring raw materials.  HANSEN controlled NWTM until

5   approximately April 11, 2016.

6        8.      Defendant DIANE RENEE ERDMANN ("ERDMANN") started working

7   for NWTM in approximately 2000.  ERDMANN was the vault manager in the

8   company's Federal Way office from approximately 2009 to April 11, 2016.  As vault

9   manager, ERDMANN's duties included allocating raw materials for bullion and

10   customer orders, as well as determining which NWTM customer orders were fulfilled

11   and in what order.  Together, HANSEN and ERDMANN controlled almost every aspect

12   of NWTM's bullion business until April 11, 2016, when they stopped working at

13   NWTM.

14        9.      In 2008, the Washington State Attorney General's Office filed a consumer

15   protection complaint against NWTM and HANSEN.  The complaint alleged that NWTM,

16   as controlled by HANSEN, misrepresented the time in which it would fill standard

17   bullion customer orders.  As a result of this complaint, HANSEN signed a Consent

18   Decree that required, among other things, that:

19        a.      HANSEN and NWTM must have a reasonable basis for making any
20   representations as to shipping time;

21        b.      HANSEN and NWTM explicitly represent the number of days in
22   which they would ship orders, or, if they did not make any representation, HANSEN and
     NWTM must ship within 30 days;

23        c.      HANSEN and NWTM must deliver within the represented shipping
24   time, unless they timely notified the customer of any delay;

25        d.      In the event of a delay, HANSEN and NWTM then must deliver
26   within an additional 30 days;

27        e.      HANSEN and NWTM must immediately refund a customer's
28   money in the event an order was not timely delivered; and

INDICTMENT/HANSEN, et al. - 3

      f.     HANSEN and NWTM must not make any misrepresentations in their business activities, including misrepresentations about delivery dates, delivery status, refunds, and the availability of goods.

10.    On April 1, 2016, HANSEN caused NWTM to file for bankruptcy in the Western District of Washington. While the initial bankruptcy filing was voluntary, and HANSEN and ERDMANN initially retained control of NWTM, the Bankruptcy Court soon appointed a Trustee. HANSEN and ERDMANN stopped working at NWTM as of April 11, 2016.

## COUNTS 1-10

### (Mail Fraud)

11.    The allegations in Paragraphs 1-10 are re-alleged and incorporated by reference as if set forth in full herein.

## THE SCHEME TO DEFRAUD

12.    Beginning no later than 2009, and continuing until June 2017, at Federal Way and at Auburn, within the Western District of Washington, and elsewhere, Defendants BERNARD ROSS HANSEN and DIANE RENEE ERDMANN, and others known and unknown, devised and intended to devise a scheme to defraud NWTM customers and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material facts, as further described below.

13.    Between 2009 and April 2016, despite the Consent Decree, HANSEN continued to make misrepresentations to NWTM standard bullion customers about shipping time and the availability of goods, and these customers continued to experience long delays in getting their orders. Further, HANSEN wrongly used customers' money to expand NWTM. In 2009, HANSEN used $2 million in NWTM funds to purchase Medallic Art Company, in Nevada. In 2011, HANSEN used more than $3 million in NWTM funds to purchase Graco Awards, in Texas. HANSEN and ERDMANN further used NWTM funds to pay their personal expenses.

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14.     By no later than 2012, NWTM lacked sufficient assets to fulfill standard bullion customer orders as they came due and required new customer money to fulfill old bullion orders.  To accomplish this, HANSEN and ERDMANN made numerous misrepresentations and material omissions to NWTM customers.  HANSEN and ERDMANN wrongfully used bullion and money that belonged to bullion-storage customers to fulfill other bullion orders.  HANSEN and ERDMANN wrongfully used bullion and money that belonged to bullion-lease customers, failed to account for these customers' interest payments, and failed to replenish their bullion.  And HANSEN and ERDMANN wrongfully obtained payments from standard bullion customers by misrepresenting the time it would take to deliver standard bullion customer orders, by misrepresenting the ability of NWTM to provide refunds, and by making other false statements and material omissions about bullion sales, purchases, and exchanges.

15.     Although HANSEN and ERDMANN fulfilled some standard bullion customer orders, these orders were fulfilled by using money from newer customers.  These orders were also fulfilled by using the bullion belonging to bullion-storage customers, even though this bullion was supposed to be safely stored.  Finally, these orders were also fulfilled by using the bullion leased to NWTM by bullion-lease customers, and, even though this bullion was supposed to replenished and accumulating interest, HANSEN and ERDMANN failed to replenish the bullion-lease customer holdings and failed to account for accumulated interest.  In this manner, HANSEN and ERDMANN used the mails to operate a fraud similar to the type commonly referred to as a Ponzi scheme.

## MANNER AND MEANS OF THE SCHEME TO DEFRAUD

**A.     Bullion customers**

16.     When standard bullion customers placed orders, BERNARD ROSS HANSEN, DIANE RENEE ERDMANN, and others working at their direction made material misrepresentations and material omissions to those customers in order to obtain those customers' money, in order to keep those customers' money, and in order to avoid

INDICTMENT/HANSEN, et al. - 5

1   detection.  At the time standard bullion customers placed orders, HANSEN, ERDMANN,

2   and their employees regularly misrepresented the expected delivery date.  In 2015 and

3   2016, HANSEN directed NWTM employees to represent, both orally and in writing, a

4   delivery date of 8-10 weeks after the receipt of good funds.  For example:

5   ■   In telephone interactions with standard bullion customers, NWTM employees

6       stated that "these orders are running about 8-10 weeks for delivery";

7   ■   In e-mails to standard bullion customers sent after orders were placed, but

8       before payment was received, NWTM employees attached order

9       acknowledgments that stated that the bullion orders would be delivered within

10      "8-10 weeks of good funds"; and

11  ■   In e-mails to standard bullion customers sent after NWTM received customer

12      payment, employees listed a specific week that was usually ten weeks from the

13      date the payment was received.

14  NWTM employees further falsely represented to standard bullion customers, both prior to

15  receiving payment and after receiving payment, that "it was our policy to ship orders

16  promptly after you have properly paid us."

17          17.     In connection with bullion orders, HANSEN and ERDMANN

18  misrepresented to customers that their funds would be used to purchase precious metals

19  to fulfill each customer's bullion order and that orders were "batched" with other similar

20  customer orders.  False and misleading statements included:

21  ■   "Please find enclosed a copy of your invoice for your recent trade with

22      Northwest Territorial Mint."

23  ■   "We operate as a brokerage – we buy to fill orders."

24  ■   "As you lock in a price and pay for your order we contract for the metals."

25  ■   "We are continuing to ship all orders in the order of payment clearance as

26      quickly as possible."

27  However, when customers paid for their bullion orders by mailing checks and making

28  wire transfers to NWTM's bank accounts, HANSEN commingled the customer money

INDICTMENT/HANSEN, et al. - 6

1  with all other funds.  HANSEN used standard bullion customers' money to fulfill orders

2  for earlier customers, to fund NWTM business operations, to expand NWTM by

3  purchasing other businesses, and to pay HANSEN and ERDMANN's personal expenses.

4  HANSEN did not keep standard bullion customers' money separate and designate it for

5  their purchases.

6       18.    By no later than 2015, HANSEN and ERDMANN were regularly failing to

7  fulfill standard bullion customer orders within the represented shipping time of 8-10

8  weeks.  Instead, at the time of the originally represented delivery date, and at HANSEN

9  and ERDMANN's direction, NWTM employees regularly sent e-mails to standard

10  bullion customers that fraudulently explained why their orders would not be timely

11  delivered.  The emails stated that "due to unprecedented demand" or "due to heightened

12  demand" or "due to the unprecedented high volume of orders that we have in line for

13  shipping" the customers' bullion orders were further delayed, and would be shipped

14  within an additional 30 days.  Moreover, such emails were false and misleading because

15  the same type of emails with the same "unprecedented" language were regularly sent by

16  NWTM employees for several years.

17       19.    HANSEN and ERDMANN caused these 30-day delay emails to be sent to

18  standard bullion customers in order to make it appear that NWTM was in compliance

19  with the Consent Decree.  After a standard bullion customer received a 30-day delay

20  email, HANSEN, ERDMANN, and NWTM employees referred to that standard bullion

21  customer order as a "drop dead" order; i.e., that customer's order must be fulfilled within

22  the additional 30 days.  During 2015, most of the standard bullion customer orders were

23  delayed in this manner, and many of these orders were fulfilled beyond the additional 30

24  days or were never fulfilled.

25       20.    Also, in order to meet "drop dead" delivery dates, to avoid customer

26  complaints, and to avoid detection, ERDMANN and others operating at her direction

27  used bullion-storage, bullion-lease, and consigned bullion to fill orders, as described

28  herein.  Further, ERDMANN, and others operating at her direction, intentionally fulfilled

some standard bullion customer orders with the wrong type or brand of bullion. ERDMANN directed NWTM employees to "mis-ship" or "substitute" a different type or brand of bullion so that it would appear that NWTM had shipped an order in compliance with the Consent Decree.

21.     Therefore, by no later than 2015, HANSEN and ERDMANN knew that the 10-week delivery time was a misrepresentation.  At the time new standard bullion customer orders were placed, HANSEN and ERDMANN were filling months-old orders. Indeed, in 2015, most bullion orders over $5000 (orders above this amount were typically standard bullion customer orders) were taking longer than the represented time to be fulfilled.  For example, more than half of the silver bullion orders over $5000 placed in January 2015 were not fulfilled until August 2015 or later – a delivery time of at least six months after the order was taken, and three-to-four months after promised.  For silver orders over $5000 placed in April 2015, more than half were not fulfilled until September 2015 or later – a delivery time of at least four months after the order was taken, and one-to-two months after promised.   For silver orders over $5000 placed in July 2015, more than half were not fulfilled until December 2015 or later (and many were never fulfilled). For silver orders over $5000 placed in November 2015, the vast majority were never fulfilled.

22.     Instead of timely fulfilling standard bullion customer orders in the order that they were placed, ERDMANN directed that smaller orders be filled first.  In 2014, approximately 50% of all bullion purchase orders were shipped past 10 weeks.  However, the delayed silver orders accounted for approximately 89% of the total value that NWTM received for silver bullion orders.  The delayed gold orders accounted for approximately 76% of the total value of money NWTM received for gold bullion orders.  In 2015, again, more than 50% of all bullion purchase orders (that were actually fulfilled) were shipped past 10 weeks.  For 2015, these delayed orders accounted for an even larger percentage of the value of the orders that were actually shipped – the delayed silver orders accounted for 93% of the total money received for these silver bullion orders, and the delayed gold

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   orders accounted for approximately 85% of the total money received for these gold

2   bullion orders.  In this manner, HANSEN and ERDMANN fulfilled orders to minimize

3   customer complaints and to avoid detection of the fraud scheme.  ERDMANN also

4   prioritized fulfilling orders where the customer had threatened to file a lawsuit or to

5   contact the authorities.  By delaying the larger orders, HANSEN and ERDMANN used

6   those customers' money to fulfill earlier customers' orders.

7        23.    HANSEN, ERDMANN, and others working at their direction, regularly

8   lied to customers to explain the various reasons for the delays for standard bullion

9   customer orders.  For example, HANSEN and ERDMANN instructed employees to

10  falsely tell customers that their orders were delayed because NWTM had to fulfill

11  government contracts and because the U.S. Mint was not producing certain products.

12       24.    NWTM also purchased bullion from customers and made exchanges of

13  different kinds of bullion with customers and HANSEN and ERDMANN misrepresented

14  to these customers that the proceeds of their sales and exchanges would be sent to the

15  customers.  When sales and exchange customers provided bullion to NWTM, HANSEN

16  and ERDMANN commingled the bullion, or sold the bullion and commingled the

17  proceeds of the sales.  Then, HANSEN and ERDMANN used the bullion, or proceeds

18  from the sale of the bullion, to fulfill orders for earlier customers or for company

19  expenses.  In some instances, they used the bullion, or proceeds from the sale of the

20  bullion, for their personal expenses.

21       25.    HANSEN and ERDMANN concealed their misuse of customer funds by,

22  among other things, manipulating NWTM's enterprise software.  HANSEN and

23  ERDMANN fraudulently inflated the amount of precious metals inventory in the

24  enterprise software to allow additional sales to be entered into the system.  Further, the

25  amounts of raw materials that were purchased were not accurately tracked in the

26  enterprise software system.  In this manner, they concealed that they were running the

27  business like a Ponzi scheme.  HANSEN demanded to other employees that both he and

28

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | ERDMANN be allowed to manipulate the software in this manner, and HANSEN told an
2 | employee that NWTM should have a system that HANSEN could "fudge."

3 | 26.    HANSEN and ERDMANN falsely represented to bullion delivery
4 | customers that NWTM would "buy back" bullion from customers at any time, and refund
5 | their money if NWTM did not fulfill their order within the time represented.  However,
6 | when customers requested refunds, HANSEN and ERDMANN wrongfully delayed or
7 | avoided those refunds by waiting until additional funds were available, by preparing
8 | refunds checks and then delaying mailing them, and by promising NWTM customers
9 | additional bullion if they agreed not to request a refund.

10 | 27.    By no later than 2015, despite growing delivery times, and longer times to
11 | refund customer money, HANSEN continued to recruit more bullion customers to keep
12 | the scheme going.  For example, in February 2016, despite NWTM's financial position,
13 | HANSEN prepared deceptive advertisements that offered free silver bullion to customers
14 | who made large bullion purchases.  The vast majority of all bullion orders over $5000
15 | that were placed in February 2016 or later were never actually fulfilled.

16 | 28.    In total, over 3000 customers paid for orders, or made bullion sales or
17 | exchanges, that were either never fulfilled or never refunded.  The total loss to these
18 | customers was more than $25,000,000.

19 | **B.    Bullion-storage customers**

20 | 29.    Individuals who hold bullion typically view bullion as a store of investment
21 | and need a secure place to store it.  NWTM, at the direction of BERNARD ROSS
22 | HANSEN, offered to store bullion for a yearly fee, either by agreeing to store customer-
23 | owned bullion that was delivered to NWTM, or by agreeing to store standard bullion
24 | customers' orders, rather than delivering those orders. However, HANSEN and DIANE
25 | RENEE ERDMANN fraudulently managed the bullion-storage program at NWTM so
26 | that HANSEN and ERDMANN could use bullion-storage customer-owned bullion and
27 | bullion-storage customer money for their own purposes.
28 |

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     HANSEN prepared and signed "Bullion Storage Agreements" that falsely represented the NWTM storage program.  Specifically, the agreements made numerous misrepresentations, including:

- ■ "NWTM shall provide secure storage for [specific customer-owned] bullion;
- ■ Upon termination with 30 days' notice, "NWTM will ship Your bullion to the last known address on NWTM's records";
- ■ "You may liquidate [convert into cash] stored bullion, in whole or in part, at any time by calling NWTM during normal business hours … and payment shall be made to You within thirty (30) days thereafter";
- ■ Bullion-storage customers "may inspect Your stored bullion at any time during NWTM's normal business hours upon reasonable notice of at least 2 business days"; and
- ■ "NWTM is required to maintain sufficient coverage at all times to cover all stored bullion at full replacement value at any prevailing market rate."

31.     In fact, customer-owned bullion that was stored at NWTM was not kept secure as represented; rather, it was used by HANSEN and ERDMANN to fulfill later bullion orders.  ERDMANN regularly directed employees to use customer-owned bullion to fill orders.  ERDMANN and other employees called this practice "borrowing" from storage or "pulling" from storage.

32.     In some instances, when NWTM bullion customers placed an order and requested that their bullion be stored, HANSEN and ERDMANN simply diverted those customers' money, used it to fund the NWTM business operations, or for their personal benefit, and failed to acquire bullion for those bullion-storage customers' orders.

33.     As a result of these practices, in many instances, the promises that NWTM was actually storing precious metal for a bullion-storage customer were false.  Further, the promises that bullion-storage customers could receive their metal, or convert their metal into cash, with 30 days' notice were false; HANSEN and ERDMANN kept

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | insufficient bullion or cash on hand to return bullion-storage customers' metal or to
2 | convert their supposedly stored metal into cash.

3 |     34.    In order to conceal their fraudulent practices in the bullion-storage program,
4 | HANSEN and ERDMANN deliberately refused to conduct physical inventories of
5 | purported customer-owned metals, despite being asked to do so by multiple employees.
6 | HANSEN and ERDMANN deliberately kept separate records for the bullion-storage
7 | program, so that the program was outside of NWTM enterprise software.   HANSEN and
8 | ERDMANN also failed to maintain insurance that would cover the theft of the
9 | supposedly-stored bullion.

10 |     35.    Despite these fraudulent practices, HANSEN and ERDMANN regularly
11 | sent false and misleading storage statements and invoices to bullion storage customers
12 | through the mails and through interstate wires.  The storage statements falsely described
13 | customers' purported storage holdings.  The storage invoices fraudulently charged
14 | bullion storage customers for these purported storage holdings, and HANSEN and
15 | ERDMANN fraudulently collected money based on those false invoices.

16 |     36.    In total, as of April 2016, more than 50 bullion-storage customers were
17 | missing some or all of the bullion that they either had delivered to NWTM for storage or
18 | had paid to be stored at NWTM.  As of April 2016, the total value of these missing
19 | storage holdings was more than $4,900,000.

20 | **C.**    **Pan American Silver Corporation**

21 |     37.    In addition to its general bullion-storage business, it was also part of the
22 | business of NWTM, as directed by BERNARD ROSS HANSEN and DIANE RENEE
23 | ERDMANN, to hold on consignment thousands of ounces of silver for the Pan American
24 | Silver Corporation (PASC).  The Consignment/Security Agreement between NWTM and
25 | PASC provided:

26 |     ■    "As needed by [PASC] to satisfy customer orders, [NWTM] shall strike the
27 |     Silver to make Coins and Bars";

28 |

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    ■ "Prior to processing of the Silver into Products, [NWTM] shall not remove the
2        Silver from the packaging or containers provided by [PASC], and shall leave
3        intact all labels or other identifying marks on such packaging or containers
4        which identify the Silver as property of [PASC]";
5    ■ "The Silver and Products made therefrom (collectively the "Metal") shall be
6        conspicuously segregated from all other metal, coins, and other products
7        located at [NWTM's] Facility and shall be clearly and conspicuously marked
8        as property of [PASC]"; and
9    ■ "[NWTM] will sell Products to its customers at prices determined by [NWTM]
10       … [PASC] shall invoice [NWTM] twice each calendar month for Product
11       purchased by and delivered to [NWTM's] customers … [and NWTM] shall
12       pay the amount of such invoice …".
13       38.    In 2011, PASC delivered 75,000 ounces of silver to NWTM.  HANSEN
14   and ERDMANN subsequently used this silver in order to perpetrate the scheme described
15   in this Indictment, rather than to fulfill orders as required by the Consignment/Security
16   Agreement.  On or about September 30, 2015, PASC requested that NWTM return the
17   75,000 ounces of silver.  Rather than admit that NWTM had used the silver, HANSEN
18   told PASC that he would return the silver, and later stated that he would return silver to
19   PASC in installments from February 2016 to June 2016.
20       39.    Neither HANSEN, nor ERDMANN, nor anyone at NWTM made any
21   further deliveries of silver to PASC.  As of April 2016, there was no segregated PASC
22   silver at NWTM offices.  The value of the missing silver, as of April 2016, was more
23   than $1,000,000.
24   **D.    Bullion-lease customers**
25       40.    BERNARD ROSS HANSEN also offered to "lease" bullion from certain
26   customers for use in the NWTM business, and, in exchange for use of the bullion,
27   HANSEN fraudulently offered to pay bullion-lease customers interest in the form of
28   additional precious metal.  However, HANSEN and DIANE RENEE ERDMANN

INDICTMENT/HANSEN, et al. - 13

1  fraudulently managed the bullion-lease program at NWTM so that HANSEN and

2  ERDMANN could use so-called leased bullion, but failed to account for interest and

3  failed to maintain adequate reserves of the leased bullion.

4        41.    HANSEN prepared and signed Bullion Lease Agreements that falsely

5  represented the bullion-lease program.  Specifically, the agreements made numerous

6  misrepresentations, including:

7        ■  NWTM "shall pay Lessor three-and-a-half percent interest (3.50%) simple

8            interest per annum in like-kind metal";

9        ■  On 30 days written notice, NWTM "shall ship Lessor's bullion to the last

10           known address"; and

11       ■  "Lessor may liquidate [convert into cash] his or her leased bullion, in whole or

12           in part, at any time by calling [NWTM] during business hours … [NWTM]

13           shall pay Lessor [NWTM's] prevailing buy price for that same product, and

14           payment shall be made to Lessor within thirty (30) days thereafter."

15       42.    Despite these statements that lease customers were earning interest,

16  HANSEN and ERDMANN failed to purchase and maintain the additional bullion that

17  they had promised to the bullion-lease customers as interest.  Despite the promises that

18  bullion-lease customers could receive their metal or convert their holdings into cash with

19  30 days' notice, HANSEN and ERDMANN kept insufficient bullion or cash on hand to

20  return bullion-lease customers' metal or to convert their supposed holdings into cash.

21       43.    HANSEN made numerous additional oral misrepresentations to bullion

22  lease customers in order to induce their participation in the lease program, including

23  misrepresenting to some of these customers that, although leased bullion would be used

24  in the NWTM business, it would be immediately replenished.  However, HANSEN and

25  ERDMANN used bullion lease customers' bullion and failed to replenish it.

26       44.    Despite these fraudulent practices, HANSEN and ERDMANN regularly

27  sent false and misleading lease statements to bullion-lease customers through the mails

28  and through interstate wires.  These lease statements falsely represented that bullion-lease

INDICTMENT/HANSEN, et al. - 14

1  customers were receiving additional metals in the form of interest and that the lease

2  customers could liquidate or take possession of their balance at any time.

3      45.    In total, as of April 2016, more than 20 bullion-lease customers were

4  missing some or all of their bullion holdings.  As of April 2016, the total value of these

5  missing lease holdings was more than $5,000,000.

6  **E.    HANSEN and ERDMANN used NWTM customer money and metals for**

7      **their own benefit.**

8      46.    Payments made to NWTM by bullion customers, as well as storage fees,

9  were commingled with other NWTM money and used for the personal benefit of

10  BERNARD ROSS HANSEN and DIANE RENEE ERDMANN.  Between 2012 and

11  2016, HANSEN took more than $1,000,000 of NWTM funds in owner's draws.  These

12  draws included taking cash from the vault for HANSEN and ERDMANN's personal use,

13  and directing the company to use NWTM funds to pay personal expenses.  Between 2012

14  and 2016, HANSEN and ERDMANN took an additional $120,000 in cash from NWTM

15  and deposited it into ERDMANN's checking account.  Finally, from 2012 to 2016,

16  HANSEN and ERDMANN used NWTM funds to pay over $400,000 in personal

17  expenses by making payments to ERDMANN's credit card.

18      47.    Additionally, HANSEN and ERDMANN used various customer-owned

19  metal that was supposed to be held for the benefit of NWTM customers for their personal

20  benefit.  Between March 2016 and June 2017, ERDMANN sold more than $700,000

21  worth of precious metals, including gold and silver bullion, and used the proceeds for the

22  benefit of herself and HANSEN.

23                    **EXECUTION OF THE SCHEME TO DEFRAUD**

24      48.    On or about the dates listed below, at Federal Way and at Auburn, within

25  the Western District of Washington, and elsewhere, Defendants BERNARD ROSS

26  HANSEN and DIANE RENEE ERDMANN for the purposes of executing the above-

27  described scheme to defraud and to obtain money and property, and attempting to do so,

28  did knowingly cause to be sent and delivered by the United States Postal Service and

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

private and commercial interstate carriers according to the directions thereon, the items listed below, each of which deliveries constitutes a separate count of this Indictment, as more particularly described below:

| Count | Approximate Date | Items Sent |
|---|---|---|
| 1 | December 31, 2014 | Metal Storage Statement (gold and silver) sent by NWTM, addressed to N.H., New Rochelle, New York |
| 2 | December 31, 2014 | Metal Storage Statement (gold) sent by NWTM, addressed to J.P. and S.P., Renton, Washington |
| 3 | January 1, 2015 | Invoice for storage fees (silver) sent by NWTM, addressed to P.M., Tunkhannock, Pennsylvania |
| 4 | January 1, 2015 | Invoice for storage fees (gold and silver) sent by NWTM, addressed to K.M., Hillsboro, Oregon |
| 5 | January 18, 2015 | Personal check from D.F. made out to NWTM, for $50.00, representing payment for storage fee, sent by D.F., addressed to NWTM, Auburn, Washington |
| 6 | September 15, 2015 | Cashier's check from B.B. made out to NWTM, for $5964.00, representing payment for silver bullion order, sent by B.B., addressed to NWTM, Auburn, Washington |
| 7 | November 6, 2015 | Personal check from R.M. made out to NWTM, for $22,437.80, representing payment for gold bullion order, sent by R.M., addressed to NWTM, Auburn, Washington |
| 8 | February 29, 2016 | Personal check from J.C. made out to NWTM, for $3099.22, representing payment for silver bullion order, sent by J.C., addressed to NWTM, Auburn, Washington |
| 9 | February 29, 2016 | Metal Lease Statement sent by NWTM, addressed to W.H., University Place, Washington |

INDICTMENT/HANSEN, et al. - 16

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 10 | March 21, 2016 | Twenty (20) half-ounce gold Krugerrand coins, sent by B.M. in exchange for promised payment of $12,548.00, addressed to NWTM, Auburn, Washington |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 11-20

### (Wire Fraud)

49.     The allegations in paragraphs 1-48 are re-alleged and incorporated by reference as if set forth full herein.

### THE SCHEME TO DEFRAUD

50.     Beginning no later than 2009, and continuing until June 2017, at Federal Way and at Auburn, within the Western District of Washington and elsewhere, Defendants BERNARD ROSS HANSEN and DIANE RENEE ERDMANN, and others known and unknown, devised and intended to devise a scheme to defraud NWTM customers and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions of material facts, as further described below.

51.     The essence of the scheme to defraud is the same as alleged in paragraphs 12-15 above.  HANSEN and ERDMANN further used interstate wires to operate a fraud similar to the type commonly referred to as a Ponzi scheme.

### MANNER AND MEANS OF THE SCHEME TO DEFRAUD

52.     The manner and means of the scheme to defraud are the same as described in paragraphs 16-47.

### EXECUTION OF THE SCHEME TO DEFRAUD

53.     On or about the dates listed below, at Federal Way and at Auburn, in the Western District of Washington, and elsewhere, Defendants BERNARD ROSS HANSEN and DIANE RENEE ERDMANN, for the purposes of executing the above-

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   described scheme to defraud and to obtain money and property, and attempting to do so,

2   caused to be transmitted by means of wire communication in interstate commerce, the

3   signals and sounds described below, each of which constitutes a separate count of this

4   Indictment, as more particularly described below:

| Count | Approximate Date | Wire Transmission |
|-------|-----------------|-------------------|
| 11 | July 28, 2014 | E-mail from NWTM, in Federal Way, Washington to R.W. and D.W., in Honolulu, Hawaii, attaching Metal Storage Statement |
| 12 | September 11, 2015 | E-mail from NWTM, in Federal Way, Washington, to K.F., in Lafayette, Louisiana, regarding delivery of bullion order by December 4, 2015 |
| 13 | October 16, 2015 | E-Mail from NWTM, in Federal Way, Washington, to S.B., in Edmonton, Kentucky, regarding delivery of bullion order by November 16, 2015 |
| 14 | November 6, 2015 | Wire transfer from Wells Fargo bank account of D.J., in Bend, Oregon, in the amount of $226,362.00, to HomeStreet Bank account of NWTM, in Federal Way, Washington, in connection with purchase of gold coins |
| 15 | November 29, 2015 | E-mail from BERNARD ROSS HANSEN in Federal Way, Washington, to S.F., in Mill Valley, California, regarding exchange of gold bullion |
| 16 | January 22, 2016 | Wire from the HomeStreet Bank account of NWTM, in Federal Way, Washington, to Brown Deer, Wisconsin, in connection with the deposit of personal check for $229,182.00, drawn on the BECU account of F.R., and payable to NWTM |
| 17 | January 28, 2016 | E-mail from BERNARD ROSS HANSEN in Federal Way, Washington, to PASC, in British Columbia, Canada, regarding return of 70,000 ounces of PASC silver |

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 18 | March 3, 2016 | E-mail from NWTM in Federal Way, Washington, to D.N., in Eldersburg, Maryland, regarding delivery of bullion order by May 6, 2016 |
| 19 | March 18, 2016 | E-mail from NWTM in Federal Way, Washington, to B.J., in Sherwood, Arkansas, regarding delivery of bullion order by April 18, 2016 |
| 20 | March 21, 2016 | E-mail from NWTM in Federal Way, Washington, to D.C., in Mountain Crest, South Carolina, regarding delayed delivery of bullion order |

All in violation of United States Code, Sections 1343 and 2.

**FORFEITURE ALLEGATION**

54.     The allegations contained in Counts 1-20 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

55.     Upon conviction of any offense charged in Counts 1-20 of this Indictment, the defendants shall each forfeit to the United States, any and all of their right, title and interest in all property, real or personal, constituting proceeds of the offense, and all property traceable to such property, including but not limited to the following:

      a.   A sum of money reflecting the amount of proceeds the defendant obtained as a result of the offenses.

56.     **Substitute Property:** If, as a result of any act or omission of the defendants, any of the property subject to forfeiture, including the above-described property:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been diminished in value; or,

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture, pursuant to Title 21, United States Code, Section 853(p), of any other property belonging to the defendants up to the value of the forfeitable property.

A TRUE BILL:

DATED: __12 April 2018__

*(Signature of Foreperson redacted pursuant to the policy of the Judicial Conference of the United States)*

_____
FOREPERSON

_____
ANNETTE L. HAYES
United States Attorney

_____
ANDREW C. FRIEDMAN
Assistant United States Attorney

_____
BRIAN D. WERNER
Assistant United States Attorney

INDICTMENT/HANSEN, et al. - 20