# EXHIBIT D

*ATTORNEY-CLIENT PRIVILEGE/ATTORNEY WORK PRODUCT*

# MEMO TO FILE

**Date:** 08/29/2011
**From:** Catherine Hopkins, Asst. GC
**CC:** Joe Beitey, GC
**Re:** Discussion w/Ross, Storage/Lease Administration

On 08/26/11, I had a confidential conversation with Ross about NWTM's storage and lease program. During the approximately 50-minute conversation, I advised Ross that I have encountered a number of problematic issues in the administration of NWTM's storage program. I included the lease component in my discussion because the record-keeping of storage and lease is maintained together and NWTM's sales reps do not distinguish between storage and lease transactions when they provide documentation to me of either. Therefore, it makes sense to view them as one program, even though they have separate functions and participants.

I advised Ross that it appears that NWTM is not complying with the requirements of our Storage Agreement in regard to customers' stored metals. Problematic practices I have observed and discussed include: (1) requests by customers to liquidate or take delivery of stored metals by customers sometimes take several weeks to fulfill. (I gave an example of an order [Schaffner] where Diane told the customer she could pick-up metals in 2 weeks, but the metals weren't actually ready for 4 weeks. I have seen other similar situations.); (2) It has taken over 2 months to retrieve serial numbers of stored metal upon customer request (ex: Frentzel); (3) When customers request to pick-up larger amounts of stored metal (ex: a million dollars worth), Bullion personnel seem panicked and Ross must be consulted, efforts are made to talk the customer into leaving items in storage; (4) I have never received reports of inventorying/auditing stored metals, not am I asked by anyone in either vault or accounting for my records on a regular basis. The one

FBI302_000074

time an accounting employee asked for my storage records, Ross advised me not to provide them; (6) When Bullion personnel buy metals from a customer's storage account, they sometimes do not verify the amount of metal stored and frequently do not verify the specific type of metal stored. As a result, a customer who has only silver bars in storage sometimes "sells back" silver rounds or some other item that is not actually being stored. No one in any department does any type of reconciliation of these transaction, to my knowledge; (7) I have heard Ross instruct Diane to "borrow" metals from storage on at least 2 occasions and in our conversation he described the practice of borrowing such metals for a few days to fulfill a different order, then replacing the metals; (8) orders to be delivered to storage often get pushed back beyond acceptable deadlines for delivery, but we are charging storage fees from the quoted delivery date; (9) NWTM is not maintaining adequate insurance coverage to fully insure all stored bullion as required by the Storage Agreement; (10) many other comments and concerns from employees from various departments have raised a suspicion that our procedures are not in compliance with our agreement.

I also advised Ross that I was not accusing him or anyone of intentional wrongdoing, nor were the people who mentioned these various issues to me. I pointed out, however, that NWTM has a fiduciary duty to the owners of the stored metals and must abide by the terms of the contract, including the delivery terms of the orders that direct metals to be placed into storage. I advised that both civil liability and criminal charges could result from the practices described above and from other potential deviations from the Storage Agreement.

Further, I advised Ross that I could be subject to civil liability and criminal charges if I knowingly assist in such activity. I also explained the risk to me of professional discipline, including disbarment, if I make statements of fraud, misrepresentation, deceit, etc. to 3rd parties, particularly beneficiary's of my client's fiduciary relationship. I advised that I cannot take this personal and professional risk and can no longer administer the storage/lease program as it currently operates.

Ross responded that he was not aware of any of the above problems, except for occasional "borrowing" of stored metals. He stated that we will implement a policy in the vault that storage metals must be available for pick-up within 2 days of a customer's request, which he notified Diane Erdmann of while I was in the room. He stated that he would have a full inventory of the vaults conducted to account for every ounce of stored metal, by sending Don-Don and Rod to do such a count in Nevada and comparing that count to the storage holdings I would provide to him. He stated we would begin conducting annual audits as well and told me he and Diane personally audited all storage metals in early 2010 and found more metals in storage than we had listed in storage records (a surplus). He said he expects to find the same thing upon a current accounting.

I believe these procedures will be followed and every effort made to comply with the Storage Agreements in the future. However, I will still be relinquishing my storage/lease administration duties to Sam Furuness's department (Accounting) as soon as practicable, per Ross's instructions. I will provide training on how to do the bookkeeping for storage and the proper procedures under the contract. At that point, Sam will become responsible for the accounting and administration of the storage/lease program. I will continue to create Storage Agreements with the customer information provided by the new administrator, but will retain no responsibility for overseeing the program or auditing its records.

FBI302_000076