The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

BERNARD ROSS HANSEN,

                    Defendant.

NO. CR18-092RAJ

**GOVERNMENT'S SENTENCING
MEMORANDUM**

Ross Hansen was convicted by a jury of committing a massive fraud that stole money and property from more than 3000 customers from across the country. For years, Mr. Hansen lied repeatedly to Northwest Territorial Mint customers to cause them to give him money and precious metal. These customers wanted a safe investment but instead were forced into a multimillion-dollar Ponzi scheme that collapsed in 2016. These lies were more than just a "flawed business model" – they caused lasting damage and the loss of more than $30 million in unfulfilled orders and stolen stored bullion. Ross Hansen has refused to take responsibility for this damage. Given the magnitude of the crime, the impact on the victims, Mr. Hansen's lack of respect for the law, to protect the public, and to provide just punishment for this crime, the Court should sentence Ross Hansen to 15 years' imprisonment.

## I.      FACTUAL BACKGROUND[1]

### A.  Hansen founds NWTM, files for bankruptcy, and goes to federal prison

In the 1980s, Defendant Ross Hansen founded a coin store and later a silver-minting company called Northwest Territorial Mint (NWTM) in Auburn, Washington. *See* Trial Exhibit 262 (Storage Invoice with NWTM insignia "est. 1984").  The government is not aware of any support, beyond his own claims, for Mr. Hansen's work history as described in paragraphs 81-85 of the Hansen PSR.

After founding NWTM, Mr. Hansen was twice convicted of federal crimes.  In 1987, Mr. Hansen was convicted of selling unregistered firearms and sentenced to 90 days of custody.  In 1991, Mr. Hansen was convicted of various money laundering and financial reporting offenses related to NWTM.  In the 1990 case, Mr. Hansen was sentenced to 30 months in custody.  *See* Hansen PSR at ¶ 70.

In 1989, prior to his second criminal conviction, Mr. Hansen filed for bankruptcy in this district.  *See In re Ross B. Hansen, et al., Debtors*, No. 89-08769TTG.  Some of the creditors in that bankruptcy were individuals who had purchased precious metal which was "on deposit" with NWTM and Hansen.  At the time of bankruptcy, according to a pleading supporting the appointment of a trustee, more than half of the precious metal that was supposed to be on deposit with Hansen was missing – some of these bullion creditors were never paid.  *See* Memo in Support of Appointment of Trustee, M.S. Interview Memo (Sentencing Exhibit 604, Sentencing Exhibit 605).  Mr. Hansen eventually was allowed to purchase the assets of the NWTM business from the bankruptcy estate.  *See In re Ross B. Hansen, et al., Debtors*, No. 89-08769TTG, Dkt. #151; *compare* PSR at ¶ 87.

//

//

---

[1] The Factual Background section of this memorandum is based on certain sections of the Presentence Report (PSR), Trial Exhibits, and counsel's recollection of the evidence at trial.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 2

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### B. Hansen expands NWTM and signs Consent Decree with AGO

By the 2000s, Mr. Hansen operated NWTM from a manufacturing facility in Auburn. NWTM both produced and sold bullion, and also offered, for a fee, "secure" on-site storage for its bullion customers in its Auburn vault. Also in the 2000s, co-defendant Diane Erdmann began working for NWTM as the vault manager. In this role, Ms. Erdmann was responsible for order fulfillment, determining what bullion products would be made and in what order the products would be shipped.

By the 2000s, Hansen was already defrauding his bullion customers by lying to them about when their orders would be delivered. At trial, Mr. Hansen's former receptionist, Diane Hopkins, testified that when bullion customers called about their orders, Hansen told her to tell them their orders would be ready in "two weeks." Ms. Hopkins knew that this was a lie. Mr. Hansen was also defrauding his storage customers. Diane Hopkins testified that, even in the Auburn vault in those early years, Mr. Hansen and Ms. Erdmann were using—in other words, stealing—storage customers' supposedly safe and secure bullion to fulfill other orders.

In 2008, the Washington Attorney General's Office (AGO) filed a Consumer Protection complaint against NWTM and Mr. Hansen and accused them of unfair business practices, including misrepresenting bullion delivery dates. Later that year, the parties settled the case and Hansen signed a Consent Decree. Trial Exhibit 4.

The Consent Decree controlled how NWTM did business and required Hansen/NWTM: 1) to tell bullion customers a specific delivery date, based on the average number of days it had taken NWTM to deliver similar goods in the past; 2) to timely notify the bullion customer when NWTM learned it could not meet that delivery date; and 3) to ship bullion within 30 additional days of the delivery date. If the product was not shipped, the Consent Decree required NWTM to provide the bullion customer an immediate refund. Critically, beyond these specifics, the Consent Decree broadly prohibited Hansen from lying to customers about key parts of the sales transaction, i.e., delivery dates, delivery status, refunds, and availability of goods. Trial Exhibit 4 at 009.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 3

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### C.  <u>Despite AGO warning, Hansen continues to expand business through fraud to his bullion customers</u>

The evidence at trial focused on NWTM bullion sales from 2009 to 2016, when Mr. Hansen moved NWTM's manufacturing operations to Nevada and its offices to Federal Way.  The evidence showed that the court-ordered Consent Decree was not followed, but rather Mr. Hansen systematically caused NWTM employees to lie about those same critical parts of the sales transaction listed in the Consent Decree – 1) delivery dates, 2) delivery status, and 3) refunds.

First, Hansen caused sales representatives to lie about the promised bullion delivery dates.  Former sales employees testified that Mr. Hansen required them to tell bullion customers that bullion orders would be delivered in 8 to 10 weeks.  Mr. Hansen knew that was a lie; orders were consistently filled weeks if not months beyond that time frame.  Defendants' employees knew this was a lie, too, but when they asked Hansen to change the timeline he refused because he believed NWTM would lose bullion customers if they told customers the truth.  Some of those same employees testified that they believed they would be disciplined or fired if they refused to tell the lies Hansen directed.

Second, Mr. Hansen, Ms. Erdmann, and employees at their direction all lied to customers about delivery status.  At the 10-week deadline, Hansen caused his employees to send a form email telling bullion customers that their bullion order would be delayed because of "unprecedented number of orders."  *See, e.g.*, Trial Exhibit 200.  These emails were more lies because delays were not unprecedented but routine.  Again, employees suggested that Mr. Hansen change the language, but he refused.

Finally, Mr. Hansen lied about the availability of refunds.  When bullion customers requested refunds, Mr. Hansen had his employees try to keep the scheme going by promising customers more bullion (that could not be delivered), lying that customer refund checks took four to six weeks to process, and backdating refund checks to cover up the fraud.  Customers were angry when their requests for refunds were stalled – because NWTM's sales pitch had misled bullion customers into believing their money

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 4

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   would be used to purchase their orders—and several victims testified to their confusion

2   about why their money could not simply be sent back if their metal had not yet been

3   bought.  The evidence at trial showed that bullion customer money was not designated

4   for a particular order but commingled and used to pay company expenses, to pay

5   Defendants, and to buy precious metal to fill older customer orders.  In this way, the

6   evidence showed that Hansen ran the NWTM bullion business like a Ponzi scheme

7   dependent on new customer money to fulfill promises to old customers.

8          Mr. Hansen greatly expanded NWTM in the years following the Consent Decree.

9   In 2009, he acquired Medallic Arts in Nevada; in 2011, he acquired Graco Awards in

10  Texas; and in 2015, he acquired the Honolulu Mint in Hawaii.  These purchases were

11  financed solely with money that was supposed to be used to fulfill customer orders.

12          **D.  Hansen and Erdmann steal from storage customers to hide their fraud**

13          After the 2008 Consent Decree, as NWTM took in more and more money, and

14  accordingly more and more customer obligations, Mr. Hansen was able to cover up his

15  lies and fraud by stealing from his storage customers.  The storage program promised

16  customers that NWTM would safely store their bullion in NWTM's vaults.  Defendants

17  labeled customer-owned bullion with the name of particular storage customer.  *See, e.g.*,

18  Trial Exhibit 400a (hearing testimony of Ross Hansen).

19          The evidence at trial showed that Defendants stole the storage customers' bullion

20  outright.  Multiple former employees testified that, at the direction of Ms. Erdmann and

21  Mr. Hansen, and usually to fulfill other bullion orders, employees repeatedly removed

22  customer-owned bullion from the vaults.  The employees knew it belonged to the storage

23  customers because it was labeled.  This practice happened when the vault was in Auburn

24  and when the vault was in Nevada.  While Ms. Erdmann tried to disguise this theft and

25  called it "borrowing," employees observed that stored metals were not replaced.

26  Hansen's employees inventoried the vaults in April 2016 and learned that $4.9 million

27  worth of customer stored metal was missing.  *See* Trial Exhibit 493.

28

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 5

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**E.  Hansen files bankruptcy for NWTM while owing customers millions**

Despite the Consent Decree, Mr. Hansen operated NWTM as a Ponzi scheme for years.  He prevented most NWTM employees from learning about how much he owed customers by refusing to file tax returns and by preventing employees from conducting a vault inventory.  Mr. Hansen's fraud came to a head in October 2015, when NWTM general counsel Greg Fullington warned him that he was running a Ponzi scheme and needed to stop taking new bullion orders and inventory the vault.  But Mr. Hansen refused to stop – instead he continued to take orders he knew could not be delivered into 2016.

In April 2016, after losing a defamation lawsuit and while owing millions to his customers, Mr. Hansen filed for bankruptcy.  At the time Hansen filed for bankruptcy, he knew NWTM could not possibly pay its bullion customers (like his 1989 bankruptcy).  Hansen knew there were millions in unfulfilled bullion orders (*see* Trial Exhibit 60); he knew there were millions in unfunded refunds (*see* Trial Exhibit 57 at 014, Trial Exhibit 86); he knew that he and Ms. Erdmann had stolen most of the customer storage; and he knew the company had a true balance of about $20,000 in the bank (Trial Exhibit 57 at 001).

Mr. Hansen tried to use the bankruptcy process to keep long-term control of NWTM, just like in his 1989 bankruptcy.  After Mr. Hansen filed bankruptcy in April 2016, he first attempted to have his own chief restructuring officer appointed.  *See In Re Northwest Territorial Mint LLC*, No. 16-11767CMA, Dkt. #12.  When the bankruptcy court appointed a trustee instead, Hansen tried to keep control of the business by paying bankruptcy lawyers to file lawsuits against the trustee.  *See Medallic Art Co. v. Calvert*, 16-C-1895-JCC.  Mr. Hansen directed hundreds of thousands of dollars worth of gold and silver to paying these lawyers.  *See* Trial Exhibits 384, 385, 386, 387, 388; *see also* PSR at ¶46.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 6

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**F.  Hansen and Erdmann are convicted of defrauding the bullion and storage customers of NWTM**

In April 2018, the Grand Jury returned an Indictment charging Defendants with mail and wire fraud for their scheme to defraud NWTM customers of their money or their property.  Dkt. #1.  The Indictment charged Defendants with defrauding NWTM's bullion customers, NWTM's storage customers, and NWTM's lease customers.  Dkt. #1.

The case proceeded to trial in July 2021.  On July 30, 2021, the jury returned a verdict finding Mr. Hansen guilty on 14 of 15 counts.  Dkt. #353.  Mr. Hansen was convicted of all nine counts related to bullion customers, all five counts related to storage customers, and was acquitted on the one count related to lease customers.

## II.   DEFENDANT'S GUIDELINE OBJECTIONS

The government has no objections to the offense level as calculated by the PSR.[2] Mr. Hansen objected to the PSR's guideline calculations as to: A) the loss amount, B) the adjustment for substantial financial hardship to 25 or more victims; and C) the enhancement for violating a court order.

### A.  Government's response to defense objection: loss amount[3]

For purposes of the sentencing guidelines, a court need only make a reasonable estimation of the loss.  *See United States v. Tadios*, 822 F.3d 501, 503 (9th Cir. 2018). Sentencing guideline enhancements must ordinarily be proved by the government by a preponderance of the evidence.  *United States v. Garro*, 517 F.3d 1163, 1168-69 (9th Cir. 2008) (approving of preponderance standard for loss calculation because defendant was

---

[2] The PSR used the 2018 Sentencing Guideline Manual but noted that the 2014 and 2015 Guideline Manuals would have reached the same result.  PSR ¶52.

[3] Defendant Erdmann objected to the 22-level enhancement and argued that an 18-level enhancement is proper based on the amount of loss from the counts of conviction (a loss of greater than $3.5 million is an 18-level increase per USSG §2B1.1(b)(1)(J).  However, this loss calculation does not include the entire scheme for which Hansen and Erdmann were convicted.  *See United States v. Treadwell*, 538 F.3d 990, 1001 (9th Cir. 2010), *rev'd on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 7

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

convicted of charged scheme).  The guidelines instruct that relevant conduct is included in the loss calculation; when the loss amount is the result of jointly undertaken criminal activity, such as a scheme or conspiracy, the loss is based on the foreseeable acts and omissions of other within the scope of the jointly undertaken criminal activity.  *See* USSG § 1B1.3(a)(1)(B); *Treadwell*, 538 F.3d at 1002.

The PSR calculated the loss amount as greater than $25 million.  PSR at ¶ 56, *citing* USSG § 2B1.1(b)(1)(L).  That is a reasonable estimate of the loss and it is supported by the evidence at trial.   Defendants defrauded bullion customer and storage customers when they were wrongfully deprived of their money or their property through the fraud.[4]  Using conservative numbers from admitted trial exhibits, this evidence shows a loss of approximately $31.4 million, as shown in the below table:

| Trial Exhibit | Loss Amount |
|---|---|
| Exhibits 60, 542 – filtered NWTM records of unfulfilled bullion orders | Approx. $22 million |
| Exhibit 86 – outstanding refunds | Approx. $3 million |
| Exhibit 192 – S.F. receipt for bullion exchange | Approx. $1.5 million |
| Exhibit 493 – missing stored bullion | Approx. $4.9 million |
|  |  |
| TOTAL | Approx. $31.4 million |

A detailed list of victims and amounts for restitution is filed in separate exhibits and discussed below.  The Court may also rely on this restitution evidence when determining the loss amount.

---

[4] Mr. Hansen cannot remove "losses from customers whose orders had not shipped" when the Trustee took over.  Mr. Hansen took bullion customer orders and storage customers' metals under false pretenses and then filed bankruptcy when the company had little money left.  *See, e.g.,* Trial Exhibit 57.  Mr. Hansen similarly tried to blame the Trustee at trial; the jury rejected this defense.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 8

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

A loss amount exceeding $25 million is consistent with other evidence.  Mr. Hansen himself testified in the bankruptcy case that there were $25 million worth of "unpaid customers" due to his management of NWTM.  Trial Exhibit 403a.  The initial 2016 bankruptcy filing – when Mr. Hansen was in control of the company – indicated that the liabilities of the business were between $10 and $50 million.  *In re Northwest Territorial Mint LLC*, No. 16-11767CMA, Dkt. #1.

**B. Government's response to defense objection: substantial financial hardship to 25 or more victims**

Guideline 2B1.1 applies different enhancements in fraud cases based on the number of victims and the financial impact to those victims.  USSG § 2B1.1(b)(2)(A)-(C).  Subsection A applies a two-level increase when the offense involves 10 or more victims, which was clearly established when the jury found Mr. Hansen guilty on 14 counts.  Subsections B or C apply a four or a six-level increase, if the offense resulted in substantial financial hardship to five or 25 victims, respectively.  To find that victims suffered a "substantial financial hardship" the Court must determine "whether the victims suffered a loss that was significant in light of their individual financial circumstances." *United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020).  The sentencing guidelines commentary directs the Court to consider, among other things, whether the offense resulted in a victim "suffering substantial loss of a retirement, education, or other savings or investment fund [or] making substantial changes to his or her employment, such as postponing his or her retirement plans." *George*, 949 F.3d at 1185, *citing* U.S.S.G. § 2B1.1 cmt. n.4(F).

The victim testimony at trial and the hundreds of victim impact statements demonstrated that the offense caused substantial hardship to more than 25 victims.  Indeed, the victim impact statements showed dozens of victims meeting that bar.  *See United States v. Bates*, 784 Fed.Appx. 312, 334 (6th Cir. 2019) (court reviewed victim impact statements to assess victim's financial circumstances to determine whether those circumstances qualified as substantial financial hardship).  More than 35 victims stated

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 9

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  how they lost a substantial portion of their retirement or investment savings.  *See*
2  VIS_001, 004, 005, 007, 009, 030, 032, 036, 040, 050, 060, 070, 072, 089, 095, 099, 111,
3  169, 199, 217, 249, 253, 276, 404, 461, 462, 468, 479, 487, 494, 495, 498, 511, 519, 560,
4  562, 677, 685, 705.  Other victims stated how they had to delay retirement.  *See* VIS_062,
5  181, 191, 278, 288, 353, 395, 418, 500.  Still other victims explained how the loss
6  impacted their own or their family's living arrangements.  *See* VIS_015, 017, 229, 348.
7  Of course, there are thousands more victims who did not submit an impact statement and
8  so the number of victims that suffered a substantial financial hardship is likely much
9  higher, but in any event multiples beyond the 25 required by the guidelines.

10         Although a victim's financial circumstances should be evaluated individually, the
11  evidence admitted at trial showed substantial losses.  The evidence showed that more
12  than 25 customers each lost over $100,000.  *See* Trial Exhibit 493 (storage losses); Trial
13  Exhibit 162 (S.F. bullion exchange); and Trial Exhibit 60 (NWTM records of unfulfilled
14  bullion orders).

15         Based on the evidence submitted by the victims and the evidence at trial, the
16  government has shown that more than 25 victims suffered a substantial financial hardship
17  and a six-level increase is appropriate.  PSR at ¶57.

18  **C. Government's response to defense objection: violation of a specific prior**
19  **judicial order**

20         Probation properly found that Mr. Hansen's offenses qualified for a two-level
21  enhancement for violation of a specific prior judicial order, that is, violating the Consent
22  Decree.  PSR at ¶58, citing USSG §2B1.1(b)(9)(C).  In response to Mr. Hansen's
23  objections, the PSR noted that Mr. Hansen caused NWTM employees to delay and deter
24  refunds, contrary to the Consent Decree's requirements.

25         In addition, the evidence at trial demonstrated other ways that Mr. Hansen violated
26  the Consent Decree.  The Consent Decree required that NWTM provide "timely notice"
27  that it would be unable to meet the shipping deadline (Trial Ex. 4 at 004), but the
28  evidence showed that Mr. Hansen caused last-minute emails to be sent out.  The Consent

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 10

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Decree required that NWTM tell its customers a specified number of days that it would

2  ship based on the average number of days it took defendants to deliver similar goods over

3  the past year.  Trial Exhibit 4 at 004.  Instead, Mr. Hansen consistently required his sales

4  employees to tell customers "8 to 10 weeks" because he thought a realistic timeframe

5  would cost sales.  Finally, the Consent Decree prohibited "any misrepresentations" in the

6  context of NWTM's business activities.  Trial Exhibit 4 at 009.  As shown at trial, and as

7  found by the jury, Mr. Hansen repeatedly lied to his customers during every step of the

8  transaction process.

9      **D.  Leadership enhancement**

10      The final PSR included a leadership enhancement for Mr. Hansen because he was

11  the organizer and leader of criminal activity that was otherwise extensive.  PSR at ¶61,

12  *citing* USSG 3B1.1(a).  This enhancement is proper based on the evidence admitted at

13  trial.  The scheme to defraud NWTM customers was "extensive" as that term is defined

14  by the commentary and the case law.  The Ninth Circuit has held that "otherwise

15  extensive" is determined by such factors as 1) the number of knowing participants and

16  unwitting outsiders; 2) the number of victims; and 3) the amount of money fraudulently

17  obtained.  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir. 1994).  All of these factors

18  support the enhancement here.  First, the company employed hundreds of workers across

19  multiple states.  Several of these workers were involved in the fraud by making

20  representations to customers at Defendants' direction and by removing customer-owned

21  metals from storage; many were not knowingly involved in the scheme.  Second, there

22  were more than 3000 victims across the United States and in other countries.  *See United*

23  *States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (upholding district court's application

24  of enhancement based on geographical reach of scheme).  Finally, the scheme involved

25  tens of millions of dollars over multiple years – the loss is more than $30 million.

26      The evidence showed that Mr. Hansen was the leader of the scheme.  He had

27  control over every aspect of the NWTM business.  He directed what representations were

28  to be made to bullion customers.  On multiple occasions he directed the use of storage

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 11

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

customers' bullion to fulfill other orders and covered up the theft by refusing to allow an
inventory.  He was the leader and deserves a four-level enhancement.

## III.    GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends that Mr. Hansen be sentenced to 15 years'
imprisonment.  This sentence is warranted by the devastation caused by Mr. Hansen's
crimes to more than 3000 victims.  A lengthy sentence is especially appropriate for Mr.
Hansen, who was warned about the harm he was causing but who has never accepted
responsibility.  A 15-year sentence sends a message to the public that the Court
recognizes the harm caused by Mr. Hansen and it is consistent with other similarly
situated defendants.

### A. Ross Hansen stole the victims' savings.

Ross Hansen cheated more than 3000 victims out of their money and property.  As
seen in the victim testimony at trial, and in the victim impact statements, most of the
victims invested in bullion because they believed it was safe investment.  They wanted
their money to be used to purchase their gold and silver bars.  They wanted to take
possession of this gold and silver and have it increase in value over time.

The victims in this case did not want their money to be put at risk, and they did not
want to place a bet on Mr. Hansen's future business.  But instead of using customer
money to purchase the customer's gold, Mr. Hansen did put that money at risk.  He
immediately it to fulfill other obligations for the business or to pay himself.  Then he
waited until more victims placed orders with NWTM.  The victims' fortunes were tied—
without their knowledge or permission—to whether Mr. Hansen could recruit more
victims.  The victims wanted gold and silver, and that is why many insisted on getting a
refund when Mr. Hansen could not deliver their goods.  But as Mr. Hansen knew, but his
customers did not, the bullion customer money was long spent.  These customers would
only get refunds if Mr. Hansen were able to push deadlines out and collect more orders to
keep his scheme going.

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As for storage customers, Mr. Hansen talked them into *paying* NWTM to steal from them—forking over fees, sometimes thousands of dollars' worth, to "securely" store their bullion at NWTM, only to have Defendants use the vault as a company piggy bank. Mr. Hansen collected those fees and delivered phony storage account statements in return.  But unbeknownst to the storage customers, Mr. Hansen used the storage customers' bullion as his own – pulling it off the shelf to fulfill other orders, at times even melting down customers' property to makes something else to ship somewhere else.

After years of Mr. Hansen's deception to his customers, it is now possible to see the result of his crimes.  That harm goes beyond the more than $30 million dollars that were stolen.  Stolen too were the plans and dreams the victims had for their savings – retirement, college funds, inheritances – those were also wiped out by Mr. Hansen.  These are not faceless "victims" but real people with families and relationships, people whose futures were upended by Mr. Hansen's theft, who lay awake at night and wondered how to navigate the altered paths his fraud left them.  Sentencing for Mr. Hansen should reflect these personal, individual losses, felt in the hundreds of statements submitted and extrapolated to the thousands of others who remained silent.

As the very first victim statement puts it: "[T]hese convicted criminals, Hansen and Erdmann, didn't just steal our money…they stole entire lifetimes of saving and investing, scrimping and cutting corners, doing without many of the 'good things' in life – travel, family vacations, better lives for our kids…They knowingly and callously took ALL of that." VIS_001 (B.J & R.J.).  So many others speak similarly and heartbreakingly of the lost work and lost time represented by their lost funds: VIS_139 (D.D.): "The money I lost due to the fraud of defendants was 10 years worth of savings."; VIS_446 (J.G.): noting the lost funds "took 3 years of my life to save"; VIS_557 (S.D.): "To me, it was 7 years of hard work, cutting costs, working extra on the weekends, and trying to get ahead for a little easier retirement."; VIS_477 (W.F.): "The investment was to be an inherentcy [sic] for my children.  How, now, do I start over?"

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 13

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   The mental anguish described is as devastating as the financial damage.  *See e.g.,*
2   VIS_003 (B.B.): "I also had emotional injury…feelings of loss, trauma, despair, anxiety
3   and anger I felt because of my monetary loss."; VIS_004 (P.M.): "My loss haunts
4   me…Almost every day I recalculate my finances...As I age how will I afford help with
5   daily living?  How will I pay for assisted living or a nursing home?"; VIS_414 (R.H.):
6   "This crime has had far reaching consequences: anxiety, sleepless nights worrying about
7   recovery of our investment, emotional trauma, inability to help my 97-year-old father
8   financially, even marital discord."; VIS_370-71 (S.V.): "I have had trouble paying bills,
9   affecting my credit, causing my anxiety which I am now taking medicine for…This has
10   made my life incredibly difficult"; VIS_377 (T.D.): "There have been many nights of no
11   sleep."

12   Though each of these victims are unique, with their own ordeals and hardships,
13   common themes emerge from their statements: many are elderly, and speak of losing a
14   substantial portion of their savings or retirement (e.g. VIS_192, 213, 229, 461, 705).
15   Many write of the impact not on themselves, but on their children and their futures (e.g.
16   VIS_161, 181, 268, 276, 381, 388, 530); *see also* VIS_514 (S.C.): "I'd very much like
17   the defendants to know that they stole from children as they ran their ponzi scheme."
18   Strained family and marital relations and guilt were common (*e.g.,* VIS_182, 275, 280,
19   326, 516, 557, 559), as was a loss of trust (*e.g.,* VIS_266, 279, 316, 473) and self-
20   confidence (*e.g.,* VIS_275, 488, 522); *see also* VIS_565 ("Outside of my financial loss,
21   this has caused me doubt my own decision making and the integrity of anyone I do
22   business with.  It's terrible to have a general attitude of distrust…This type of criminal is
23   just as damaging as someone who inflicts physical harm, and possibly worse."  So many
24   unfairly blame themselves for falling victim to defendants' scheme.  *E.g.,* VIS_663
25   (C.F.): "In little more than a few months of my father's passing, I squandered this portion
26   of their accumulated love and sweat."

27   These themes repeat across the hundreds of victim statements, and many victims,
28   like D.M., describe the devastation caused:

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 14

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

I had to take on extra jobs which kept me away from my family at night.  It put a strain on my relationship…I have had to work several more years to make up for my loss.  It caused a lot of stress in my life, sleepless nights, embarrassment, anger, arguments with love[d] ones… I missed family get togethers, vacations, my grandson's first steps, etc. … It hurt not being there with them and it can't be replaced!

VIS 423-24 (D.M.).  These are the stories of people who lost not just money, but time, health, and hope.  VIS_386 (D.T.) "I am 65 and feel hopeless.  We – my husband and I – are hard working people who were just trying to secure a safe way to make it in this world."

The amount of harm to these victims is staggering.  The crime calls for a significant punishment.

### B. Ross Hansen's characteristics, particularly his lack of respect for the law, support a lengthy sentence.

Mr. Hansen's lack of respect for the law also supports a 15-year sentence.  Mr. Hansen signed and then intentionally violated the AGO Consent Decree.  The 2008 Consent Decree provided written guidelines as to how NWTM was supposed to do business.   It required a specific *realistic* delivery date, a window to ship if the delivery date was missed, and then an immediate refund.

Mr. Hansen knew and understood the requirements of the Consent Decree but he refused to follow it.  Former in-house counsel Cat Hopkins testified that she told Hansen he was violating the spirit of the Consent Decree.[5]  Former in-house attorney Greg Fullington testified that he told Hansen that he and NWTM were committing fraud.  *See also* Trial Exhibit 11.  Attorney Dino Vasquez testified that when he was hired to perform a so-called audit of NWTM's practices, he was not provided with information about whether NWTM was actually meeting delivery dates.  Because of these warnings, Mr.

---

[5] Cat Hopkins also told Mr. Hansen that he could be criminally liable for theft of customer-owned bullion.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 15

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Hansen cannot claim that he made a mistake or used a "flawed business model" but rather he was intentionally deceiving his customers.

The Court may also consider other examples of Ross Hansen's lack of respect for the law. Mr. Hansen failed to file federal income taxes numerous times. Mr. Hansen caused an internet disparagement campaign to tamper with a lawsuit with a former landlord. PSR at ¶ 94. During the trial in this case, he tried to influence the testimony of a former NWTM employee witness on a break, while that witness was on the stand. *See* PSR at ¶ 50. These actions show someone who believes that the law and the rules of this Court do not apply to him. The sentence in this case should send a message that Mr. Hansen is not above the law.

Finally, Mr. Hansen has a criminal history. He was twice convicted for federal criminal offenses and served time in federal prison. Mr. Hansen knew the consequences of his criminal behavior and committed this offense anyway.

### C. Ross Hansen has no remorse for committing these offenses and the sentence must be sufficient to deter him and to protect the public.

Mr. Hansen knew for years that he was cheating and deceiving customers but continued (even when explicitly warned to stop by Cat Hopkins and Greg Fullington). Instead, Mr. Hansen kept wrongfully taking new customer money until he decided to "get out of the bullion business" and filed bankruptcy. But Mr. Hansen's plan was to maintain control of NWTM. When the bankruptcy court appointed a trustee, Mr. Hansen knew that his fraud was going to be discovered and so he fought to take over the company and directed Diane Erdmann to sell gold and silver to pay for his lawyers. *See* PSR at ¶ 46, Trial Exhibits 384-388. Mr. Hansen could have made efforts to assist in the recovery of the millions of dollars NWTM owed to thousands of customers. But rather than showing remorse, he fought and obstructed the Trustee, wasting NWTM resources, in a futile attempt to regain control of his company and to hide his crimes.

Similarly, as of the filing of this sentencing memo, Ross Hansen has not accepted any responsibility. The sentencing guidelines recognize the "legitimate societal interests"

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 16

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    in acceptance of responsibility.  USSG § 3E1.1, cmt. Background.  Mr. Hansen did not

2    accept responsibility because he wanted to restart a bullion business and again take

3    people's money.  The sentence in this case must deter Mr. Hansen from this conduct.

4    The sentence in this case must be long enough to protect the public from Mr. Hansen – so

5    he cannot sell bullion, or assist others in selling bullion, or take any customer money or

6    investments in any capacity.

7          **D. Ross Hansen must receive just punishment for his offense by receiving a**
8             **sentence that is consistent with similarly situated defendants.**

9         This case – 3000 victims, $30 million in loss, a defendant without remorse – needs

10   a lengthy sentence to provide just punishment for the offense.  The sentence in this case

11   must demonstrate to the public that an extensive and intentional fraud will be met with an

12   extensive punishment.

13        Further, a sentence of 15 years' imprisonment is appropriate because it is

14   consistent with sentences imposed in other similar cases.  The government is aware of

15   several cases like this one – where the operator of a bullion business defrauds customers

16   and/or falsely promises to safely store bullion for customers.

17        In *United States v. Larry Bates, et al.*, CR 17-6263-SHL (W.D. Tenn.) the

18   defendant and others were convicted at trial of running a bullion business that diverted

19   customer money to fund business expenses, personal expenses, and to fulfill prior orders.

20   *United States v. Bates*, 784 Fed.Appx. 312, 322-23 (6th Cir. 2019).  After trial, the court

21   found that Larry Bates was responsible for $21.6 million in loss and sentenced him to 262

22   months' imprisonment. *Id.* at 333.

23        In *United States v. Galen Rust*, CR 19-164-TMR (D. Utah), Rust promised

24   investors that their money would be used to buy and trade silver, that investors' funds

25   would be used to buy actual silver, and that silver bullion purchased would be safely

26   stored.  Statement in Advance of Plea, Dkt. #134.  However, Rust did not use investor

27   funds as promised and had little stored silver and instead used the money on himself and

28   to make payments to previous investors like a Ponzi scheme.  After a plea, the court

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 17

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  sentenced Rust to 19 years' imprisonment and ordered Rust to repay $153 million in

2  restitution to hundreds of victims.  https://www.justice.gov/usao-ut/pr/owner-rust-rare-

3  coin-sentenced-19-years-prison-running-fraudulent-silver-trading-

4  program#:~:text=SALT%20LAKE%20CITY%20%E2%80%93%20Gaylen%20Dean,mo

5  ney%20laundering%2C%20and%20securities%20fraud.

6          In *United States v. Charles McAllister*, CR 18-16-LY (W.D. Tex.), defendant was

7  convicted at trial of defrauding the customers of his bullion business.  McAllister ran a

8  company that offered bullion trading services and bullion storage services.  The evidence

9  at trial showed that McAllister deceived customers into believing that their bullion was

10  stored in company vaults when it was not.  *See United States v. McAllister*, 844

11  Fed.Appx. 696, 697-98 (5th Cir. 2021).  The court sentenced McAllister to ten years'

12  imprisonment and ordered $16 million in restitution.

13          In a similar case from this district, *United States v. Aaron Michael Scott*, CR 18-

14  5500-RBL, defendant pleaded guilty to wire fraud.  Scott operated Blue Moon Coins in

15  Vancouver, Washington, a business that purchased and sold precious metals.  Scott

16  obtained customer money by falsely promising that it would be used to fulfill the

17  customer's order; instead, that money was used to for his own purposes and to fulfill

18  earlier customer orders where the money had already been spent.  *See* CR 18-5500RBL,

19  Dkt. #14 at 4-7.  The Honorable Ronald B. Leighton sentenced Scott to 48 months'

20  imprisonment and ordered him to pay $1.3 million in restitution.[6]

21  _____

22  [6] The government is aware of other recent examples of fraudulent bullion business operators receiving significant sentences: In *United States v. Esposito, et al.*, CR 19-208-CEM (M.D. Fla.), defendants

23  pleaded guilty to conspiring to defraud the customers of their bullion business by using customer money that was intended to purchase and hold bullion to pay business expenses and to fulfill prior orders.  The

24  defendants also provided their customers with false account statements.  Defendants acknowledged that there were approximately 120 victims in the case at the loss was over $5 million.  Defendant Salvatore

25  Esposito was sentenced to 87 months in prison and defendant Joseph Esposito was sentenced to 71 months' imprisonment.

26          In *United States v. Hannes Tulving*, CR 15-115-MOC (W.D.N.C.) defendant pleaded guilty to an

27  Information.  Tulving admitted that he induced customers to place orders for gold and silver knowing those orders could not be fulfilled as promised.  He admitted that his scheme had more than 380 victims

28  and caused more than $15 million in loss.  The court considered Tulving's cooperation and Tulving's

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 18

1   Another comparison from this district is *United States v. Mark Spangler*, CR 12-
2   133-RSM; Spangler was convicted at trial of a scheme to defraud investors; like this case,
3   Spangler defrauded his customers and falsely promised investors that their money would
4   be used for safe investments.  The Honorable Ricardo S. Martinez sentenced Spangler to
5   16 years' imprisonment and ordered him to pay $19.8 million in restitution.

6   Mr. Hansen's conduct was like that of these convicted felons – he used his
7   knowledge of the precious metals industry to take in customer money and promised to
8   use it as customers directed.  But as the evidence at trial showed, he deceived customers
9   and ultimately caused more than $30 million in loss.  To treat Mr. Hansen similarly to
10  other defendants, a 15-year prison sentence is just punishment for this crime.

11  **IV.     GOVERNMENT'S RESPONSE TO PROBATION'S SENTENCING**
12  **RECOMMENDATION**

13  The government strongly disagrees with the seven-year sentence recommended by
14  Probation.  The government disagrees with how Probation recommendation applied
15  multiple Section 3553(a) factors.  The sentence, pursuant to Section 3553(a), must
16  adequately recognize the nature of the offense, that is, long-term fraudulent conduct that
17  caused more than $30 million in loss to more than 3000 victims.  The sentence in this
18  case must recognize the seriousness of the harm – the devastating impact on those
19  victims, as discussed above.  The sentence in this case must also consider how Mr.
20  Hansen's sentence compared to other similarly situated defendants, like the other bullion
21  defendants, or other WDWA defendants.

22  Further, the government respectfully disagrees with the reduced recommendation
23  because of concerns about Mr. Hansen's health, especially because these concerns are not
24  supported by any evidence in the record but based on Mr. Hansen's own self-report.  PSR
25  at ¶ 100-101.  This is particularly inappropriate given his conviction for a years-long

26
27  health as departures from the guidelines and sentenced Tulving to 30 months' imprisonment.  Tulving
28  Sentencing Transcript, CR 15-115-MOC at 6-7, 57-65, Dkt. #35.

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 19

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

scheme of lies and deceit.  Needless to say, Mr. Hansen is not reliable, and his unverified

claims deserve far more skepticism.  At other places in the PSR, Mr. Hansen also made

other self-reports about his early graduation from high school, his history flying planes

for the government in South America, and his founding of NWTM in 1986.  *See* PSR at

¶¶ 78-85.  This information was not in Mr. Hansen's earlier PSR.  Mr. Hansen did not

provide a collateral contact for additional verification of the information in the PSR.  PSR

at ¶ 75.  Mr. Hansen's unverified claims should not be the basis for a substantially lower

sentence.

But even if Mr. Hansen has been diagnosed with medical conditions as claimed,

the Probation office recognized that the Bureau of Prisons is equipped to handle these

conditions.  It is not grounds for a lower sentence.

## V.    RESTITUTION

Mr. Hansen should be ordered to pay restitution in the amount of $33,744,166.92,

to the victims listed in Sentencing Exhibit 601.  Sealed Sentencing Exhibit 601.  This

exhibit lists all the various victims of Mr. Hansen's scheme – bullion customers,

customers who requested refunds, storage customers, and others.  The government will

request that the Judgment adopt this $33.7 million number and reference Exhibit 601.

The basis for Sentencing Exhibit 601 is summarized in Sentencing Exhibit 603.

*See* Sealed Sentencing Exhibit 603.  Exhibit 603 reflects the FBI's comprehensive review

of the evidence supporting restitution in this case.  As explained in Exhibit 603, the FBI

reviewed several sources:

| Source | Description |
| --- | --- |
| Trial Exhibit 60 (admitted at trial) | Spreadsheet from NWTM Epicor system of delayed orders |
| Trial Exhibit 62 (marked but not admitted) | Spreadsheet from NWTM Epicor system of unfulfilled orders |
| Bankruptcy claims | Signed claims submitted by victims as part of 16-11767 bankruptcy case |

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 20

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Trial Exhibit 86 (admitted) | Bullion customer refund tracker |
| --- | --- |
| Trial Exhibit 493 (admitted) | Storage loss spreadsheet |
| Trial Exhibit 192 (admitted) | S.F. bullion exchange email[7] |
| Trial Exhibit 57 (admitted) | R.V. unpaid bullion purchase |

The government is prepared to present testimony from the FBI case agent at sentencing, if necessary, to support its request for restitution as per Exhibit 601. The spreadsheets marked as Exhibit 601 and 603, along with other backup spreadsheets, were produced to the Probation Office and to defense counsel in September 2021. (Some addresses in Exhibit 601 have been updated.)

Finally, Ross Hansen and Diane Erdmann should be jointly and severally liable for the restitution amount in this case with the exception of the $1.5 million to S.F.

## VI.   MR. HANSEN SHOULD BE REMANDED.

A person who has been found guilty of an offense and who is awaiting execution of a sentence shall be detained unless there is clear and convincing evidence that the person will not flee and will not pose a danger to the community. 18 U.S.C. §3143(a)(1). Mr. Hansen should be remanded to begin serving his sentence. Mr. Hansen has not accepted any responsibility for this offense and while out of custody he poses a risk of flight and a danger to the community. Remand is appropriate here.

//

//

---

[7] Ms. Erdmann was acquitted of the count related to the S.F. bullion exchange.

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VII.   CONCLUSION

The government respectfully recommends that the Court sentence Ross Hansen to 15 years' imprisonment followed by three years of supervised release.  The government also requests that Mr. Hansen be ordered to pay $33,744,166.92 in restitution.

Dated this 22nd day of April 2022.

Respectfully submitted,

NICHOAS W. BROWN
United States Attorney

*s/ Brian Werner*
BRIAN WERNER
BENJAMIN DIGGS
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: (206) 553-7970

Government's Sentencing Memorandum - Hansen
*United States v. Hansen & Erdmann, CR18-092RAJ* - 22

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970