1

THE HONORABLE RICHARD A. JONES

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

UNITED STATES OF AMERICA,

10

                              Plaintiff,

11             v.

12   BERNARD ROSS HANSEN,

13                              Defendant.

Case No.  CR18-0092-RAJ

ROSS HANSEN'S SENTENCING
MEMORANDUM

**Redacted version for public filing.
Unredacted version filed under seal.**

14

15        Despite owning and running Northwest Territorial Mint ("NWTM"), a huge, multimillion-

16   dollar company, Ross Hansen lived modestly, living in a rented home for $1,650 a month, and

17   wearing the same humble jeans and shirts each day.  If Mr. Hansen were a greedy man, he could

18   easily have done better for himself.  He could have taken tens of millions of dollars in owner's draws

19   from his company, stripping it of its assets as it began to fail.  But he did not do so.  That is because

20   Mr. Hansen, unlike most fraud defendants, was not motivated by personal greed.  He did not want

21   to enrich himself at the expense of others, to take from others without delivering anything of value

22   in return.

23

24

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 1

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

He instead just wanted his company to succeed.  The success of his company depended on its customers, and, as the evidence at trial reflected, Mr. Hansen "wanted customers to be satisfied." Trial testimony of C. Hopkins.  He had "no intent . . . to take people's money and never give them bullion," the former general counsel of the company explained.  *Id.*  To the contrary, if he could have had his way, NWTM would have fulfilled every one of his customer's orders, so that the business could have continued to succeed.  This is not to negate or excuse the crimes for which he was convicted—regrettably, many of NWTM's customers ultimately did not get what they ordered and lost money.  But when determining a sentence, the Court should take into consideration that Mr. Hansen never wanted those losses to happen.

Although the Court must take the Sentencing Guidelines into consideration, it should find that the Sentencing Guidelines in this case fail to account for many of the relevant facts at issue, and that the guideline range is not reasonable.  For one, the Sentencing Guidelines are primarily driven by the amount of losses caused by the defendant's conduct.  But that arithmetic-based approach fails to account for a defendant's motivation.  In a typical fraud case, one dollar of loss is one dollar that the defendant wanted to steal from another so he could enrich himself.  But that is not the case here. Mr. Hansen was not driven by personal greed and never wanted to hurt his own customers.

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 2

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

The guideline range as calculated in the presentence report is also overstated.  For one, the presentence report should have used Mr. Hansen's gain from the offense, rather than the estimated losses, because the losses attributable to Mr. Hansen were impossible to reasonably estimate.  Numerous government witnesses testified at trial that the records that the government used to determine the losses in this case are utterly unreliable.  And, even if there were reliable records, the losses to the customers of NWTM were from a combination of factors, including ones not attributable to Mr. Hansen, such as the incompetence and malfeasance of the trustee who took over the company after the bankruptcy.  In these situations, where reliably estimating the loss amount is impossible, the Court can and should look instead to Mr. Hansen's gain from the offense.  Doing so better reflects the culpability of Mr. Hansen, and  dramatically reduces the guidelines calculation in this case—reducing the guideline range from life down to 70–87 months.

Regardless of which guidelines calculation the Court determines to be the correct one, Mr. Hansen recommends that the Court impose a custodial sentence substantially below the recommendation made by the probation office.[1]

## I.       THE HISTORY AND CHARACTERISTICS OF ROSS HANSEN

In determining a sentence, this Court is called upon to evaluate Mr. Hansen's personal history and his characteristics, so that the Court can assess his "immediate misconduct" within the larger "context of his overall life." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).

**A.  Mr. Hansen built NWTM from the ground up.**

Throughout the mid-to-late 1990s, Ross Hansen worked non-stop, living in the same building as his business, and totally committing himself to the success and growth of his company, NWTM.  December 20, 2021 Presentencing Report (PSR), ¶ 90.  And, through this hard work, his business

---

[1] Mr. Hansen has requested that we not recommend a specific sentence.

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 3

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

slowly began to grow and succeed.  *Id.* ¶ 90.  By the 2000s, it was flourishing.  What had been Mr. Hansen's storefront business had grown into a company that moved tens of millions of dollars' worth of precious metals each month.  *Id.* ¶ 91.

All the while, Mr. Hansen maintained the lifestyle of a small-business owner—living a modest life entirely dedicated to his work.  He put in long hours, working late into the night.  As one witness put it at trial, Mr. Hansen "was probably as dedicated a person as" he had ever "seen in any trade."  Trial testimony of J. Goodfellow.  Another witness recalled that he "never took a personal vacation."  Trial testimony of G. Fullington.  He lived modestly.  He paid himself no set salary— taking owner's draws only as he needed them—and rented a house near his office for $1,650 a month.  *See* trial testimony of A. Trunkett.  And he "wore the same jeans and three shirts every day."  Trial testimony of G. Fullington.  None of this changed as the business grew.

Despite the booming success of NWTM—which came to sprawl across multiple locations in multiple states, with hundreds of employees—Mr. Hansen still ran the business the way a small business owner might run a storefront operation.  He tried to work with each of his employees directly, like a small shopkeeper might.  The testimony of the Chief Information Officer, Paul Wagner, is perhaps the clearest expression of this:  When asked to describe Mr. Hansen's style of management, Mr. Wagner quipped that Mr. Hansen had "350 direct reports," explaining that Mr. Hansen tried to "work[] through all 350 people directly."  *See* trial testimony of P. Wagner.  When asked to explain why he picked the number "350," Mr. Wagner explained "that's how many employees the company had."  *Id.*  When it came to managing the company's finances, Mr. Hansen made decisions based on the amount of cash the company had in the bank on any particular day.  *See* trial testimony of A. Trunkett ("Q: And what did you prepare -- what is the cash report?  What does it look like?  A: The cash report is just a single page report of -- out of the Excel program and it just

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 4

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

gave the current figures. It was just an Excel spreadsheet on a single sheet of paper."); trial testimony of J. Young ("Q: . . . [H]e was making decisions based on those cash reports that he was getting, right?   A: Just to clarify, are we talking about the cash position report that he got from Annette Trunkett?   Q: Yes.   A: I believe that's correct.").

**B.  Mr. Hansen today is impoverished ███████████████ .**

On April 1, 2016, NWTM declared bankruptcy.  At that time, Mr. Hansen's already-modest finances collapsed along with the company's, and by 2018 he did not even have enough assets to pay for a lawyer to represent him in his criminal case.  Dkt. 10.

Since the bankruptcy, Mr. Hansen has lived a law-abiding life, focused on caring for his significant other, Diane Erdmann, ███████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████ ███████████████████████  Mr. Hansen has diligently complied with his conditions of pretrial release.  PSR ¶ 5.  He has attended every Court proceeding and maintained contact with pretrial services as required under his bond conditions.  Aside from one instance of contact with a witness, he has never been found to have violated his bond in the three-and-a-half years since it was issued.

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 5

## II.     ANALYSIS OF SENTENCING FACTORS

When sentencing a defendant, Courts are called upon to determine and "'impose a sentence that is sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (quoting 18 U.S.C. § 3553(a)).  This determination is committed to the sound discretion of the sentencing judge.  "Sentencing," the Ninth Circuit has recognized, "is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012).  Indeed, in this individualized determination, not even the range recommended by the now-advisory Sentencing Guidelines can be presumed to be reasonable.  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Instead, the Guidelines are but one factor among the others articulated in 18 U.S.C. § 3553(a) that are all to be considered when determining a sentence.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

### A.  Mr. Hansen was not motivated by greed or malice.

Mr. Hansen does not a deserve a life sentence.  His sentence should instead reflect that his mistakes were not derived from personal greed, or a desire to take from others without giving anything in return, but instead from a desire to save his company and to catch up on what he had promised to others.

Multiple government witnesses at trial testified that Mr. Hansen always wanted to deliver to his customers what they had ordered.  Catherine Hopkins—the former general counsel of NWTM— acknowledged in her testimony that Mr. Hansen "wanted customers to be satisfied" and that "there was no intent that [she] observed . . .to take people's money and never give them bullion."  Trial testimony of C. Hopkins.  Annette Trunkett—once the top accountant at the company—backs that up.  She testified that Mr. Hansen was "always" buying raw metal with the "purpose" of getting "the

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 6

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

metal to the customers in the form that it had been ordered." Trial testimony of A. Trunkett. And Kim Neff—a former customer service representative for the bullion department—testified that she "thought that Mr. Hansen was trying to do the right thing" and that "he was trying to get precious metal to the customers" who had paid for it. Trial testimony of K. Neff. Or as another NWTM general counsel, Greg Fullington, once put it, Mr. Hansen never "meant to screw people out of money." Trial testimony of G. Fullington. Even one of the government's undercover informants agreed that Mr. Hansen "wished for his customers to get metal." Trial testimony of J. Young.

This remained true even as the company began to fail. Rather than grabbing whatever he could for himself—as he easily could have done—Mr. Hansen instead kept trying to get metal to his customers. Even when "it wasn't able to be done," testified one government witness, "the goal was still there." *See* trial testimony of K. Neff.

This consistent goal of trying to deliver to his customers what they had ordered makes him different than most defendants convicted of fraud. Rather than taking from others to enrich himself, never intending to pay back what he had taken, Mr. Hansen was instead constantly trying to catch up on his company's obligations to others, and always wanted to deliver on everyone's orders. He ultimately failed in this effort—and the jury found that he defrauded customers along the way—but none of this happened because Mr. Hansen was trying to steal from others to enrich himself. His lack of personal greed and his underlying desire to make good on his obligations should be reflected in his sentence.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 7

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278



BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**C.  A sentence of 84 months is not necessary to achieve sufficient deterrence.**

As a result of the failure of his business and this prosecution, Mr. Hansen has no capacity to ever operate anything like NWTM again.

Nor would any others look to Mr. Hansen's situation and want to emulate him.  Mr. Hansen has lost everything he worked for over the past 25 years.  And he will never get even a fraction of his money or respect back.   Academic studies and courts have found that *these* types of consequences—more than the length of a prison sentence—are what deter would-be white-collar offenders.  *See Adelson*, 441 F. Supp. 2d at 514 (noting that "even relatively short sentences can

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 9

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

have a strong deterrent effect on prospective 'white collar' offenders" and collecting authorities); *see* Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) (observing that white-collar "offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty").

**D. Mr. Hansen's sentence should be consistent with the sentence in the comparable case of *United States v. Tulving.***

Although this case is unique in many ways, there is one case that bears striking resemblance to it.  In *United States v. Tulving*, 15-cr-115 (W.D.N.C.), as here, the defendant was the sole owner and president of a precious-metals bullion business.  *See Tulving*, Dkt. 1, ¶ 2.  And, in *Tulving*, as here, the defendant was convicted of fraud for inducing customers to place bullion orders that he knew could not be fulfilled as advertised.  *Id.* ¶ 5.  And, like here, the alleged losses were substantial: The losses in *Tulving* totaled over $15 million.  *Id.* ¶ 1.  There were some differences: Mr. Tulving, pleaded guilty and cooperated, but also had lived far more extravagantly during his offenses than Mr. Hansen ever did—according to a transcript of Mr. Tulving's sentencing hearing, Mr. Tulving drove a Ferrari and paid $30,000 a month out of the business for a condo for himself.  *See Tulving*, Dkt. 35 at 39.  Mr. Tulving was ultimately ordered to pay more than $15 million in restitution and was sentenced to 30 months in prison.  *See Tulving*, Dkt. 43.  And while perhaps some disparity between Mr. Tulving's sentence and Mr. Hansen's may be warranted to account for Mr. Tulving's acceptance of responsibility and cooperation, the evidence in this case does not support a *substantially* longer sentence for Mr. Hansen than for Mr. Tulving.  The sentence of 84 months recommended by the probation office would be nearly triple what Mr. Tulving received and would indeed create an unwarranted sentencing disparity.

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 10

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

**E. The Sentencing Guidelines.**

As the Court is well-aware, the sentences prescribed by the Guidelines are merely one factor to be considered in crafting a sentence; the only truly dispositive criterion is *reasonableness*. *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("[A]ny post-*Booker* decision to sentence outside of the applicable guidelines range is subject to a unitary review for reasonableness, no matter how the district court styles its sentencing decision."). In this case, the guideline range should carry little weight.

The Sentencing Guidelines have been frequently criticized for focusing in fraud cases on the pure arithmetic of the financial losses. "As many have noted," one court observed, "the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509 (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Because the Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss," the sentencing ranges recommended by the Guidelines are often unjust and arbitrary. *See id.*

That is especially true here. For one thing, the Guidelines fail to account for Mr. Hansen's atypical motivation. As discussed above, unlike most defendants convicted of fraud, Mr. Hansen was not driven by greed. The Guidelines take no account of that, but instead determine his sentence purely based on the numbers. The Guidelines are also especially arbitrary in this case, with a wide swing in the Guidelines depending on how one calculates them. Whereas the presentence report and the government calculated Mr. Hansen's total offense level to be a 43, corresponding with a guideline range of life in prison, Mr. Hansen's counsel calculates the total offense level to be a 27, corresponding with a guideline range of 70–87 months. Leaving aside the merits of these respective

positions, this wide swing in guideline ranges shows just how arbitrary the Guidelines can be—turning not on the culpability of the defendant but on how the losses (or gains) attributable to the defendant are determined.

Given the arbitrary nature of the Guidelines in this case, counsel for Mr. Hansen recommends a sentence that is significantly below the sentence recommended by the probation office, regardless of how the Court ultimately calculates the Guidelines in this case.  But to the extent the Court does look to the Guidelines, it should adopt this memorandum's calculation of the total offense level and corresponding sentencing range.  As explained below, the presentence report miscalculates the sentencing range in two respects:  It miscalculates the loss amount under section 2B1.1, and it improperly applies an enhancement for violating a prior, specific decree.

    1.  <u>The loss amount cannot be reasonably determined and is vastly overstated in the presentence report's calculations.</u>

The application notes for section 2B1.1 of the Sentencing Guidelines instruct the Court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  Application note 3(B) to U.S.S.G. § 2B1.1.  The loss amount cannot reasonably be determined here.  For one, the presentence report's loss calculation is based on the government's calculations, which are in turn based on records that multiple witnesses described at trial as being unreliable and full of incomplete and inaccurate data.  Not only that, but it is also impossible in this case to separate out the losses from the offense from losses from other sources, most notably the losses flowing from the incompetence and malfeasance of Mr. Hansen's successor, the bankruptcy trustee Mark Calvert.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

i.  *The presentence report's loss calculation for bullion customers is based on a recordkeeping system that multiple government witnesses and an expert have testified was unreliable.*

Multiple witnesses testified throughout the trial that NWTM's "Epicor" recordkeeping system was essentially worthless.  Yet that is precisely the system that the government—and the presentence report—relied on to calculate the loss amount to standard bullion customers in this case. *See* Layne Decl. at ¶ 71.  Because that system was incapable of reliably supporting those calculations, the Court should reject the government's calculations and find that there is no reasonable way to estimate the losses.

Epicor, as multiple witnesses testified at trial, was nothing short of a disaster as a recordkeeping system for the company.  The system was incapable of recording orders unless the metal was already in the mint's possession—a flaw that rendered the system essentially useless for a company that bought metals to fill orders, rather than maintaining an inventory.  *See* Layne Decl. ¶¶ 75–76.  Not only that, the system had bugs that would result in fulfilled orders showing as open and unfulfilled.  *See, e.g.*, Trial Exs. 1728, 1734; trial testimony of J. Young.  Members of the accounting group that reviewed the company's finances after the bankruptcy described the data derived from Epicor as being "broken" with much data "either missing or inaccurate."  Layne Decl. ¶¶ 81–82.  The company had "poor record keeping and inefficient systems" another person put it. *Id.* ¶ 84.  And the bankruptcy trustee himself even went so far as to conclude that "accounting records *did not exist*" at NWTM as the "company was r[u]n more like a personal hobby than as a business." *Id.* ¶ 85 (emphasis added).

Given this unrebutted testimony and evidence that the data in the Epicor system was unreliable, the Court should agree with Ms. Layne and conclude that the use of this data renders the loss calculation unreliable.  It should instead find, as did Ms. Layne, that "it is not possible to accurately and reliably calculate loss in this matter." *Id.* ¶ 94.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

*ii. The presentence report's loss amount for storage customers is based on unreliable inventories.*

The loss-amount calculation for storage customers is likewise unreliable.  That calculation relies upon an inventory conducted by the bankruptcy trustee, Mark Calvert.  But that inventory was flawed in several serious ways, making it unreasonable to rely on it to even estimate losses in this case.  Anne Layne, an expert in forensic accounting, has examined Mr. Calvert's work and found it flawed in several ways, including a reliance on incomplete NWTM records, a failure to use more reliable third-party records, a failure to consider alternative sources of loss, and a flawed method of identifying customer-owned metals.  *See* Layne Decl. ¶¶ 50–70.  In fact, Mr. Calvert himself described his own inventory as "inconclusive" and "incomplete."  *Id.* at ¶ 68.  Ms. Layne agrees, concluding that Mr. Calvert's inventory "*cannot* be relied upon for calculation of loss in this matter." *Id.* ¶ 69 (emphasis in original).  The Court should conclude likewise and find that it is not possible to reasonably estimate the losses attributable to Mr. Hansen using Mr. Calvert's unreliable inventory.

*iii. The loss amount fails to account for the unforeseeable incompetence and malfeasance of the bankruptcy trustee.*

Not only is the presentence report's source data entirely unreliable, but it also fails to properly account for the significant portion of the losses that were attributable to the malfeasance and incompetence of Mr. Hansen's successor—the bankruptcy trustee, Mark Calvert.  At the time Mr. Calvert took over, he estimated that the losses to the creditors of NWTM would be nowhere near the loss amount the presentence report has adopted in this case.  Mr. Calvert told the bankruptcy court during bankruptcy proceedings that creditors could expect to receive a distribution of 50–75 percent. *See* Layne Decl. ¶ 38.  Yet Mr. Calvert instead squandered away the assets of the company.  The bankruptcy court overseeing Mr. Calvert's work found that Mr. Calvert not only made many blunders but also tried to enrich himself at the expense of the estate, while making numerous

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 14

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

misrepresentations to hide his misdeeds.  *See generally* Order of Fee Applications, *In re Nw. Territorial Mint*, No. 16-11767, Dkt. 2118; Layne Decl. ¶¶ 22–32.

Mr. Hansen should not be held responsible for losses attributable to Mr. Calvert.  The unforeseeable and intervening acts of others are not attributable to the defendant.  Indeed, in *United States v. Hicks*, 217 F.3d 1038, 1049 (9th Cir. 2000), the Ninth Circuit vacated a sentence because the Court failed to consider whether the losses attributable to the defendant "were inflated by the intervening, independent, and unforeseeable criminal misconduct of [a] foreclosure agent."  In that case, the defendant had made false statements that induced a bank to make loans for certain properties.  *Id.* at 1041.  The loss amount was then determined by taking the loan amounts and subtracting the value of the properties after the bank foreclosed on them.  *Id.* at 1047.  But the foreclosure agent's actions "resulted in the properties' being sold at unreasonably low prices," artificially inflating the loss amount.  *Id.*  The Court concluded that "because the district court heard no evidence and made no findings with respect to Defendant's allegations that the bank's losses were inflated by the intervening, independent, and unforeseeable criminal misconduct of the foreclosure agent" the sentence had to be vacated.  *Id.* at 1049; *see also United States v. Lonich*, 23 F.4th 881, 917 (9th Cir. 2022) (vacating sentence where district court failed to account for factors not attributable to the defendant that may have contributed to loss).

Here, similarly, Mr. Calvert's actions greatly inflated the losses in this case.  This was unforeseeable—although some missteps from a trustee are perhaps to be expected, the magnitude of Mr. Calvert's missteps was beyond what any business owner could reasonably foresee.  Perhaps the best reflection of this is the extraordinary order of the bankruptcy court denying Mr. Calvert *any* compensation for his work managing NWTM's estate.  *See* Order of Fee Applications, *In re Nw. Territorial Mint*, No. 16-11767, Dkt. 2118 at 84-85.  In that Order, the court found that Mr. Calvert

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 15

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

improperly paid himself at the expense of the estate (pp. 25-26), tried to mislead the court into approving artificially inflated breakup fees (pp. 6-8), engaged in costly litigation that generated no value for the estate (pp. 79-82), and otherwise "ma[d]e[] several missteps in his efforts to liquidate assets" (p. 19). These were "not merely . . . a series of bad judgment calls," the court explained. *Id.* at 80. Mr. Calvert "violated the Bankruptcy Code, Bankruptcy Rules, and orders of the Court, and he made multiple misrepresentations, large and small, to the Court and other parties." *Id.* Anne Layne, an expert fraud examiner and accountant, has also examined Mr. Calvert's conduct and likewise concluded that he "violat[ed] the ethical standards of his profession," did not act "in the best interests of the interested parties in the bankruptcy," and "reduced the value of the estate and therefore the amount paid to NWTM creditors." Layne Decl. ¶¶ 31–32. Ms. Layne observes that Mr. Calvert "made numerous questionable decisions that resulted in significant expense to the bankruptcy estate." *Id.* ¶ 48.

The government's loss figures fail to account in any way for Mr. Calvert's role in driving losses to the victims in this case. It does not account for the fact that, by Mr. Calvert's own estimate, the victims should have received back 50–75% of their money. It does not account for the costs to those victims of Mr. Calvert's incompetence and malfeasance as a trustee.

It is impossible to do so now. It is impossible to determine with any degree of certainty, for example, what assets might have been returned to the creditors by a bankruptcy trustee who acted competently and with integrity. *Cf. id.* ¶¶ 37–39 (discussing returns that Mr. Calvert had represented he expected to obtain). The Court should therefore find that losses cannot be reasonably estimated in this case because it is impossible to fully account for—or even to reasonably estimate—the effect of Mr. Calvert on those losses.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

*iv.  Rather than using an unreliable loss estimate, the Court should instead use Mr. Hansen's personal gain from the offense in determining his offense level.*

Application note 3(B) to U.S.S.G. § 2B1.1 instructs the Court to use the "gain that resulted from the offense as an alternative measure" in cases where "there is a loss but it reasonably cannot be determined."  Here, because there is a loss, but it cannot be reasonably determined, the Court should instead use Mr. Hansen's personal gain from the offense.

Estimating Mr. Hansen's personal gain is more straightforward than trying to estimate the losses in this case.  At trial, the government introduced extensive evidence of the owners' draws taken by Mr. Hansen and Ms. Erdmann.  *See, e.g.*, Trial Ex. 84.  Certainly, not all of those owners' draws are gains from the offense—much of those are proceeds from business operations of NWTM that the government has never contended were fraudulent, such as the timely delivery of bullion orders or the production of distinguished service medals for the U.S. military.  To estimate what portion of the owners' draws are proceeds from the offense, the Court should look to the amount of owners' draws starting from July 2015, which is the month in which NWTM began taking substantial numbers of bullion orders that it would ultimately not be able to fulfill.  *See* Trial Ex. 1473.  From July 2015 until the bankruptcy in 2016, the owners' draws benefitting Mr. Hansen totaled only $97,030.  *See* Layne Decl. ¶ 12.  The Court should use that figure—a gain of $97,030—in determining how many points to add under § 2B1.1(b)(1).  Doing so results in an 8-point increase under § 2B1.1(b)(1), as opposed to the 22-point increase proposed by the presentence report.[3]

In addition to being the correct application of the Guidelines, using Mr. Hansen's gain to determine the offense level also better reflects his culpability.  Again, in a typical fraud case, one dollar of loss is one dollar that the defendant wanted to steal from another and keep for himself.  But,

---

[3] This gain amount of $97,030 also puts Mr. Hansen just above the cutoff for the next bracket down (which ranges from $40,000–$95,0000).  *See* U.S.S.G. § 2B1.1.  If he were in that next bracket, his total offense level would then be 25, with a corresponding sentencing range of 57–71 months.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

here, Mr. Hansen did not want to take money from others without delivering anything in return.  The loss amount reflected in the presentence report, which includes millions of dollars of losses that Mr. Hansen never wanted to happen, thus vastly overstates his culpability.  The Court should instead look to the gain amount recommended in this memorandum, which better reflects his motivation and culpability.

> *v.   At the very least, the Court should deduct the losses that were attributable to Mr. Calvert.*

At the very least—even if the Court rejects the position that losses cannot be estimated in this case—the Court should deduct out losses that can be attributed to Mr. Calvert.  As Ms. Layne explains in her declaration, nearly $9 million of the losses calculated by the government consist of orders that were still pending and timely at the time that Mr. Calvert took over the business and decided to discontinue all bullion operations.  Layne Decl. at ¶¶ 34–36, 91.  Another nearly $5 million of losses are derived from Mr. Calvert's unreliable inventory.  *Id.* at ¶ 92.  And another $3.165 million are refunds based on unreliable data.  *Id.* at ¶¶ 82, 93.  Subtracting out these figures would dramatically reduce the loss amount in this case to $16,701,063.  *Id.* ¶ 94.  The disparity between that number and the government's proposed number of $33,744,166 just goes to show how unreliable any estimate of loss is in this case, and further supports the use of Mr. Hansen's gain as an alternative measure for purposes of sentencing.

2.   <u>The consent decree does not warrant a 2-point enhancement.</u>

The evidence is not sufficient to support the application of a sentencing enhancement for having violated a "prior, *specific* judicial or administrative order."  U.S.S.G. § 2B1.1(b)(9)(C) (emphasis added).  The presentence report asserts that the evidence at trial showed the defendants violated a prior consent decree with the state of Washington, but, in closing remarks, the government itself disavowed that the evidence in this case established or depended upon whether the defendants

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 18

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

violated the consent decree.  "[W]e . . . need to be very clear," counsel for the government explained, "[t]his case is not about whether the defendants violated the consent decree."  In fact, the only aspect of the consent decree that the government even bothered to mention in closing was the unspecific requirement that the defendants "have to be honest."

Despite the government's own disavowal of the consent decree, the presentence report nevertheless finds that the enhancement should apply because NWTM was required to "tell bullion customers they could liquidate their order prior to the promised delivery date" and to provide customers with the "option of a refund" if their orders were delayed.  PSR at Response to Obj. 58.  But the evidence at trial makes clear that customers *were* clearly informed that they could liquidate their order prior to the promised delivery date and that they had the option of a refund if their orders were delayed.  In fact, NWTM used the precise language that the consent decree required them to use.  *Compare* Ex. 4 (Consent Decree) at 7–8 *with, e.g.*, Ex. 160 (bullion confirmation notice).

> **Order Liquidation Policy**
>
> When you place your telephone order, you enter into a binding contractual agreement with Northwest Territorial Mint to remit payment in full based on the prevailing market purchase price agreed upon at the time your order was placed. Should you choose to buy-back your order prior to the date of delivery, Northwest Territorial Mint will liquidate your position based on the prevailing market purchase price at the time of

CONSENT DECREE                    7                    ATTORNEY GENERAL OF WASHINGTON

BERNARD ROSS HANSEN'S
SENTENCING MEMORANDUM
(Case No. CR18-0092 RAJ) - 19

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

> buy-back. You will be liable for any difference in the event of a market loss. If the prevailing market price of the items has gone up since your order, Northwest Territorial Mint will pay you the higher prevailing market price for your items. However, in the event we are unable to ship your order by the date promised, we will contact you and give you the option of buying back your order based on the spot market price at that time or agreeing to wait an addition period of time for your order, which shall not be more than 30 days. If we are unable to deliver after the additional period of time has elapsed, we will pay to you the full purchase price or the prevailing spot market price, whichever is higher.
>
> **Shipping Time**
>
> Our policy is to ship orders promptly. However, reductions in inventory resulting from an increased demand for certain bullion products and other reasons may delay shipping. If we cannot ship your order within the delivery time represented to you at the time of purchase, we will inform you prior to the expiration of that period of time that we are unable to meet the delivery date, and you may buy-back your order and obtain a full payment of the prevailing market price at the time of liquidation.

*Ex. 4 (consent decree).*

> **SHIPPING TIME**
> Our policy is to ship orders promptly after you have properly paid us. However, reductions in inventory resulting from an increased demand for certain bullion products and other reasons may delay shipping. If we cannot ship your order within the delivery time represented to you at the time of purchase, we will inform you prior to the expiration of that period of time that we are unable to meet the delivery date, and you may buy-back your order and obtain a full payment of the prevailing market price at the time of liquidation. Generally, gold, palladium and platinum are shipped via United States Postal Service Registered Insured mail. Silver is usually shipped via Federal Express Ground.
>
> **ORDER LIQUIDATION POLICY**
> When you place your order, you enter into a binding contractual agreement with us to remit payment in full based on the prevailing market purchase price agreed upon at the time your order was placed. Should you choose to sell your order prior to the date of delivery, we will liquidate your position based on the prevailing market purchase price at the time of buy-back, provided you have properly paid us. You will be liable for any difference in the event of market loss. If the prevailing market price of the items has gone up since your order, we will pay you the higher prevailing market price for your items. However, in the event we are unable to ship your order by the date promised, we will contact you and give you the option of initiating a buy back of your order based on the spot market price at that time or agreeing to wait an additional period of time for your order, which shall not be more than 30 days. If we are unable to deliver after the additional p eriod of time has elapsed we will pay you the full purchase price or the prevailing spot market price, whichever is higher.

*Ex. 160 (example of confirmation email to customer).*

And the evidence at trial shows that many customers indeed chose to exercise the refund option contained in this notice. In fact, refunds were over a quarter of NWTM's cash outflows in its final months of operations. *See* Trial Ex. 1474.



*Trial Exhibit 1474.*

Testimony from one of the government's star witnesses at trial—NWTM's prior general counsel, Greg Fullington—further confirms that NWTM was complying with the consent decree's shipping requirements.  Mr. Fullington agreed during his testimony that "inability to ship is contemplated" in the consent decree and that "the deal that the Mint was making with its customers was consistent . . . with the requirement that the consent decree had in it."  Trial testimony of G. Fullington.  He further testified that the refund notice complied with the consent decree, testifying that "inability to ship is contemplated" and that "[g]iven the reference to a refund if shipping did not occur, this is also consistent with the requirements found in the AG consent decree."  *Id.*

To the extent that the government relies instead on the consent decree's requirement that NWTM must not make misrepresentations—or, as the government put it in closing, "be honest"— this is not the type of *specific* prohibition that would warrant the application of this enhancement.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

The application notes for this enhancement make clear that, for the enhancement to apply, the consent decree must have ordered the defendant "to take or not to take a *specified* action." U.S.S.G. § 2B.1.1 Cmt. 8(C) (emphasis). The consent decree's language prohibiting "any misrepresentations in the context of [NWTM's] business activities" does not satisfy this standard. This is nothing but a vague requirement to act honestly—there is no "*specified* action" that NWTM was required to take or not take.

3.      <u>Sentencing Calculation</u>

After correctly determining the loss/gain amount, and removing the enhancement relating to the consent decree, the correct total offense level is **<u>27</u>**. This corresponds to a sentencing range of **<u>70–87 months</u>**.

**F. Mr. Hansen should be permitted to surrender voluntarily.**

Mr. Hansen respectfully requests that he be permitted to self-report, as the probation office has recommended in its Release Status Report. Under 18 U.S.C. § 3143(a)(1), a defendant is permitted to remain on supervised release pending the execution of a sentence if the Court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." Mr. Hansen by now has a long history of complying with his conditions of supervised release and has never demonstrated that he is likely to flee or pose any sort of danger to anyone. There is no reason to believe that this would change after the imposition of a sentence.

**III.      CONCLUSION**

For the foregoing reasons, Mr. Hansen respectfully recommends a custodial sentence substantially below the sentence recommended by the probation office.

///

///

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2278

DATED this 22nd day of April, 2022.

CALFO EAKES LLP

By _____s/Angelo J. Calfo_____
    Angelo J. Calfo, WSBA #27079
    Henry C. Phillips, WSBA #55152
    1301 Second Avenue, Suite 2800
    Seattle, WA 98101
    Telephone: (206) 407-2200
    Fax:  (206) 407-2278
    Email: angeloc@calfoeakes.com
            henryp@calfoeakes.com

*Attorneys for Defendant Bernard Ross Hansen*