**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUN 17 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. BERNARD ROSS HANSEN, AKA Ross B Hansen, Defendant-Appellant. | No. 22-30102 D.C. No. 2:18-cr-00092-RAJ-1 MEMORANDUM* |
| UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DIANE RENEE ERDMANN, AKA Diane Renee, Defendant-Appellant. | No. 22-30103 D.C. No. 2:18-cr-00092-RAJ-2 |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted May 9, 2024
Seattle, Washington

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Before: MURGUIA, Chief Judge, and McKEOWN and OWENS, Circuit Judges.

Bernard Ross Hansen and Diane Renee Erdmann ("Defendants") appeal from their convictions for mail and wire fraud as the owner and vault manager, respectively, of the Northwest Territorial Mint ("NWTM"). As the parties are familiar with the facts, we do not recount them here. We affirm both Defendants' convictions and sentences.

1. Defendants primarily contend that the district court improperly denied their motion for acquittal based on insufficient evidence of their "specific intent to defraud" and the existence of a "scheme to defraud." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (citing 18 U.S.C. §§ 1341, 1343). We review the denial of a motion for acquittal de novo. *United States v. Yates*, 16 F.4th 256, 264 (9th Cir. 2021). "There is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Sullivan*, 522 F.3d at 974 (citation omitted).

To prove intent to defraud, the jury must find that Defendants had "the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). This intent "may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). Intent also "may be inferred from

misrepresentations made by the defendants, and the scheme itself may be probative circumstantial evidence of an intent to defraud." *Sullivan*, 522 F.3d at 974 (citation omitted). "[T]o prove a 'scheme to defraud,' the jury must find that the defendant employed 'material falsehoods.'" *United States v. Galecki*, 89 F.4th 713, 737 (9th Cir. 2023) (emphasis omitted) (citation omitted).

There is sufficient evidence to support Defendants' convictions. They made extensive material misrepresentations to NWTM customers to secure orders they could not—and did not—fulfill. Defendants told customers that NWTM "operate[s] as a brokerage" and "buy[s] to fill orders." But they used customer money for various expenses, such as Hansen's legal fees, business expansion, refunds to other customers, and Defendants' personal expenses. As Defendants concede, these spending decisions left them with very little cash flow to fulfill customer orders.

Even though they knew NWTM could not fulfill orders within eight to ten weeks, Defendants told customers that orders would be shipped within that time frame. Even after NWTM's general counsel informed Hansen that a consent decree between NWTM and the Washington Attorney General required the company to "tell customers the accurate expected timeframe for delivery," Hansen maintained that they were allowed to quote eight to ten weeks and ship in fourteen weeks.

Erdmann argues that there was insufficient evidence that she had a specific intent to defraud because she rarely interacted with customers. But she was "second in command" to Hansen, was in charge of "which orders would go and which would not," at times dictated the eight-to-ten week timeframe given to customers, and inflated inventory numbers.

Defendants' misrepresentations were material. One NWTM sales associate testified that discussing longer delivery times with customers would have led to a drop in sales. *See Galecki*, 89 F.4th at 737 ("'[A] false statement is material if it has "a natural tendency to influence[] or [is] capable of influencing"' the decisionmaker to whom the statement 'was addressed.'") (third alteration in original) (citation omitted)). The high number of customer complaints were "always, or almost always about the delivery times for bullion [the customers] had ordered."

Relying on *United States v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024), Defendants argue that their misrepresentations did not go to the "nature of the bargain." But they did not deprive their customers "of accurate information alone." *Id.* at 942. They stated that customers would receive either bullion or a refund within a certain time frame, but the customers received neither. Defendants cite *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), but that out-of-circuit case is distinguishable for the same reason. *Id.* at 1312-14 (holding that

4

there was no fraud where "the alleged victims 'received exactly what they paid for,'" because "a defendant 'schemes to defraud' only if he schemes to 'depriv[e] [someone] of something of value'" (alterations in original) (citations omitted)).

Even if the record supports conflicting inferences, we "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution[] and must defer to that resolution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citation omitted). Because a rational trier of fact could have found the elements of mail and wire fraud beyond a reasonable doubt, there was sufficient evidence to support the Defendants' convictions.

2. Defendants next argue that Juror 34 was actually biased. They did not raise this claim at trial, so we review for plain error. *See United States v. Mitchell*, 568 F.3d 1147, 1149-50 (9th Cir. 2009). "[A]ctual bias is . . . the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (citation omitted). "A juror is . . . impartial 'only if he can lay aside his opinion and render a verdict based on the evidence presented in court.'" *Id.* at 1114 (citation omitted). Defendants did not move to dismiss Juror 34 for cause, so they "must show that the evidence of partiality before the district court was so indicative of impermissible juror bias that the court was obliged to strike [the juror] from the jury." *Mitchell*, 568 F.3d at 1151.

Defendants have not demonstrated plain error. They point out that Juror 34 indicated that it had crossed their mind that Defendants "must have done something" if "the federal government [was] spending so much time on them," and that they "ha[d] a negative view of criminal defense lawyers, because they try to get their clients off on technicalities." But, while the juror stated that they "hate[d] to see" a prosecution fail due to a "technicality," they also said, "that's the way the system should work," and "[e]veryone charged with anything deserves the best defense they can get[,] [s]o if there was a technicality, that is a legitimate technicality." Thus, the case Defendants rely on, *United States v. Kechedzian*, 902 F.3d 1023, 1030 (9th Cir. 2018)—in which a juror, who was asked three times whether she could be impartial, "explicitly noted that she was unsure if she could put her personal biases aside"—is distinguishable. Defendants also have not shown structural error. *See Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (explaining that this court has "never held" that a district court commits structural error by failing to "investigate *potential* juror bias").

3. Defendants also claim that the district court's loss calculations for sentencing and restitution were unreasonable because—according to their expert—there was no reliable evidence of the loss amount. We review the district court's application of the Sentencing Guidelines and restitution calculation for abuse of

6

discretion, reviewing underlying factual findings for clear error. *See United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008).

For sentencing "the court 'need only make a reasonable estimate of loss, given the available information.'" *United States v. Tadios*, 822 F.3d 501, 503 (9th Cir. 2016) (citation omitted). "[E]ven when a fact has an extremely disproportionate effect on the sentence," a district court need only find it by preponderance of the evidence. *United States v. Lucas*, 101 F.4th 1158, 1162 (9th Cir. 2024) (en banc).

"We may uphold a restitution order 'where the district court fails to make pertinent factual findings . . . when the basis of the district court's calculations is clear.'" *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (ellipsis in original) (citation omitted). "[T]he district court may utilize only evidence that possesses sufficient indicia of reliability to support its probable accuracy." *Id.* at 951-52 (citation omitted).

The district court based its restitution amounts on the same loss calculations it used for sentencing and found there was "more than sufficient evidence to support" the government's loss amount. This evidence included: $4.4 million worth of missing property belonging to bullion storage customers, $3 million in refunds owed to customers, $22 million in unfulfilled orders, and $1.5 million that NWTM owed to a specific customer.

7

These factual findings are not clearly erroneous, and they support Defendants' sentencing enhancement and restitution amount. The district court's refusal to discredit this evidence based on the testimony of a single defense expert was not clear error. Accordingly, the district court did not abuse its discretion.

Defendants next contend that the district court failed to rule on their objections under Federal Rule of Criminal Procedure 32. Because they did "not object at sentencing to [the] district court's compliance with the Rule, we review for plain error." *United States v. Wijegoonaratna*, 922 F.3d 983, 989 (9th Cir. 2019).

Defendants have not shown plain error. The district court acknowledged Defendants' objections to its loss calculations and stated that "[w]hile challenges certainly can be raised . . . collectively, they do not warrant a variance to the degree your lawyers request," and that it "believe[d] that the loss amounts, as presented, [are] supported by the trial testimony and evidence," *See id.* at 990 (holding that the district court satisfied Rule 32 when it "ma[d]e clear that [it] was aware of [the defendant's] objections but disagreed with them").

4. Hansen separately argues that the district court improperly denied his motion for a new trial because the testimony by NWTM's former general counsel and assistant general counsel was more prejudicial than probative. We review this claim for abuse of discretion. *United States v. King*, 660 F.3d 1071, 1076 (9th Cir.

8

2011). "If the court concludes that . . . a serious miscarriage of justice may have occurred, it may set aside the verdict[] [and] grant a new trial . . . ." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992).

NWTM's former lawyers testified that they had conversed with Hansen about the dubious—in their view—legality of NWTM's business practices. The district court did not abuse its discretion in determining that admitting this testimony for the sole purpose of showing "what was communicated to [Hansen]" was permissible and did not constitute a serious miscarriage of justice. *See United States v. Graf*, 610 F.3d 1148, 1164-65 (9th Cir. 2010) (holding that similar testimony was admissible "to show that [the defendant] was on notice that his conduct was illegal").

5. Hansen next contends that his trial was unfair because "[t]he Government exceeded proper advocacy . . . by invoking analogies to Bernie Madoff and by disparaging the defense." Hansen did not make this objection at trial, so we review for plain error. *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1150 (9th Cir. 2012). "A criminal conviction will not be overturned on the basis of a prosecutor's comments unless in context they affected the fundamental fairness of the trial." *Id*.

Hansen has not met this high bar. He was the first to invoke Madoff in his opening statement and continually made references to Madoff throughout trial and in his closing argument. The government made only a few references to Madoff,

all in its closing argument. *See United States v. Falsia*, 724 F.2d 1339, 1342 (9th Cir. 1983) ("[W]here the defendant opens the door to an argument, it is 'fair advocacy' for the prosecution to enter." (citation omitted)).

Hansen asserts that the government "disparaged the defense with numerous arguments that exceeded fair argument," such as calling the defense's arguments "a joke" and "a distraction." But none of the government's remarks were prejudicial enough to constitute plain error—let alone warrant overturning Hansen's convictions.

6. During deliberations, the jury asked a question about Instruction 22. Erdmann contends that the jury was confused because the instruction reflected an incorrect statement of co-schemer liability, and the district court inadequately responded to this confusion when it referred the jury back to the instructions as written. We review this purported error for abuse of discretion. *United States v. Warren*, 984 F.2d 325, 329 (9th Cir. 1993).

Erdmann contends that the jury should have been instructed that it was "required to find that each count at issue fell within the *scope* of her unlawful agreement." But in *United States v. Stapleton*, 293 F.3d 1111, 1118 (9th Cir. 2002), this court affirmed—in Erdmann's own words—"a co-schemer instruction that . . . omitted" what she terms "the scope requirement." Even though *Stapleton* acknowledged that vicarious liability law "dr[aws] a parallel to conspiracy law," it

10

did not endorse the version of co-schemer liability Erdmann urges us to follow. *See id.* at 1115-18. As Erdmann acknowledges, Ninth Circuit Model Instruction 15.33 tracks the language affirmed in *Stapleton*, and Instruction 22 mirrors the model instruction. Erdmann does not rely on any cases holding that the "scope" element of co-conspirator liability from *Pinkerton v. United States*, 328 U.S. 640 (1946), is imported into co-schemer liability in cases like this—fraud cases with no conspiracy charge.

The district court thus did not abuse its discretion by referring the jury back to the language of the original instructions. "The necessity, extent and character of additional instructions are matters within the sound discretion of the trial court." *United States v. Collom*, 614 F.2d 624, 631 (9th Cir. 1979) (citation omitted). The court explained it did not want to give "more instructions that contradict each other." *See id.* (stating that when "attempting to respond to the question directly would . . . risk[] further confusion," a judge "act[s] appropriately in merely rereading the previously given . . . instructions"). Erdmann's reliance on *Warren* misses the mark. There, the possibility that the response the defendant requested would mislead the jury was "remote." 984 F.2d at 330. Here, the basis of Erdmann's proposed response was—as addressed above—a novel and unsupported theory of co-schemer liability. Such a response would have misled the jury as to the correct legal standard.

Erdmann also advances a claim for relief under the cumulative-error doctrine. Because we reject all of her other claims of district court error, we do not reach this argument.

**22-30102: AFFIRMED.**

**22-30103: AFFIRMED.**